# EMMA G. CHIPMAN

## *vs.*

# FARMERS & MERCHANTS NATIONAL BANK.

*Usury*: *payments by others than the borrower; voluntary pay-
ments.   Loans on chattels*: *Acts of* 1894, *Chapter* 629;
*interest; loans on real and personal property.   Na-
tional banks*: *interest; Revised Stat-
utes; sections* 5197, 5198.

The usury laws of this State do not render the contract
void; but only permit the borrower to recover, in law or in
equity, the amount paid by him in excess of the interest allowed
by law; or he may, when sued on a usury contract, be allowed
such excess.                                    p. 355

But usury laws are enacted for the protection of the *bor-
rower* only from the oppressive demand of the lender; and only
from excessive burdens imposed on the *borrower* is relief af-
forded.                                        p. 355

One of the conditions of a written agreement under which a
bank made a loan to a debtor was that, in addition to the legal
rate of interest, a debt owed by a third party to the bank should
be paid by the borrower, if not paid before a certain date by
certain relatives of the third party.   Such payment was in fact
made by the relatives.   *Held*, that there being no evidence that
such payment was made at the request of the borrower, the bank
was not guilty of usury.                        p. 357

Voluntary payments can not be recovered. p. 356

A party is not entitled to recover payments which he was under moral obligation to pay. p. 356

While relief may be had from usurious demands, regardless of the device resorted to by the lender, a borrower can not recover what he has not actually paid, in the absence of some statute authorizing him to do so. p. 356

Under sections 5197 and 5198 of the Revised Statutes of the United States, recovery may be had for interest charged by national banks in excess of that which is allowed by law; but such actions must be commenced "within two years from the time the usurious transaction occurred." p. 358

Chapter 629 of the Acts of 1894, prohibiting corporations from making any loan on the security or chattels, etc., otherwise than in its own name, or at any rate higher than 6 per cent., and declaring such contracts in violation of such provisions to be null and void, does not apply to mortgages on real or leasehold property. p. 356

This Act does not apply to a mortgage covering both chattels and leasehold property. p. 356

*Decided June 25th, 1913.*

Appeal from the Circuit Court of Baltimore City (BOND, J.).

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Richard S. Culbreth,* for the appellants.

*Edward Duffy,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court of Baltimore City dissolving an injunction granted upon the application of the appellants and dismissing their bill of complaint.

On the 5th of June, 1906, a petition was filed in the District Court of the United States for the District of Maryland against Henry C. Chipman, who was engaged in the business of manufacturing and selling chairs in Baltimore City, to have him adjudged a bankrupt, and he received his discharge in bankruptcy on the 23rd of March, 1907. At the time the petition was filed he was indebted to his wife, Emma G. Chipman, in the sum of $62,000.00; to his brother, Washington Chipman in the sum of $54,246.30; to his daughter, Mary C. Chipman, in the sum of $48,263.06; to his daughter, Jennie C. Dushane, in the sum of $38,298.52; to the Third National Bank of Baltimore in the sum of $13,500.00; and to the Farmers and Merchants National Bank, the appellee, in the sum of $24,156.60, which claims were filed against his estate. On the 14th of August, 1906, Emma G. Chipman, Washington Chipman, Mary C. Chipman and Jennie C. Dushane executed the following agreement:

"This agreement made this 14th day of August, 1906, by and between Washington Chipman, Mary C. Chipman, Emma G. Chipman and Jennie C. Dushane, hereinafter styled assignors, and Edward N. Rich, assignee. Whereas, the assignors, and each of them, did on the third day of July, 1906, in writing, duly assign all their and each of their respective claims and debts against the estate of Henry C. Chipman, bankrupt, and all dividends that may be due on said claims to the said Edward N. Rich, assignee, and at the time the said assignment was made it was agreed by and between the parties hereto that the said assignee should use, appropriate and apply all dividends received on said claims to the payment and satisfaction of the debts due by the said Henry C. Chipman, bankrupt, to the Third National Bank of Baltimore City, until said

debts were paid in full, and that after the payment in
full of the debts due by the said bankrupt to the afore-
said bank the said Edward N. Rich, assignee, should
pay the balance of said dividends to the asignors, the
same to be paid by a check to the order of all of said
assignors; and, whereas, it has been agreed by and
between the parties hereto that the said Edward N.
Rich, assignee, shall pay the balance of the said divi-
dends, which may remain in his hands after the pay-
ment has been made of the aforesaid debts of the
Third National Bank, to the Farmers and Merchants
National Bank, on account of the debts due the said
bank by the said bankrupt. Now, therefore, this agree-
ment is executed and witnesseth, that the assignors do
hereby authorize and direct the said Edward N. Rich,
assignee, to pay over to the Farmers and Merchants
National Bank of Baltimore City on account of the
debts due by the aforesaid bankrupt to the said bank,
all of the aforesaid balance of the said dividends that
may be received by him, until the said debt and inter-
est shall be paid in full."

The agreement contained the further provision that the
amount so paid by said Rich might be charged by him against
all the assignors, or against any one or more of them, and
that he should not be required to apportion the same "be-
tween" them.

On the 13th of September, 1906, the Farmers and Mer-
chants National Bank and George H. Chipman, a son of
Henry C. Chipman, entered into the following agreement:

"This agreement, made this 13th day of September,
1906, by and between the Farmers and Merchants Na-
tional Bank of Baltimore and George H. Chipman:
Witnesseth, That for and in consideration of the agree-
ment made and entered into this day by and between
Edward N. Rich and the said Farmers and Merchants
National Bank the said Farmers and Merchants Na-
tional Bank agrees with the said George H. Chipman
that it will procure a loan of forty thousand dollars

($40,000.00) to be made to said Chipman, which loan
is to be secured by a first mortgage, with the usual
covenants, conditions and agreements satisfactory to
said bank on the leasehold property on the south side
of Boston street in the City of Baltimore, and the im-
provements thereon, and the plant, machinery, tools,
furniture, fixtures and appliances located therein, and
also located on the fee simple lot of ground or in the
improvements thereon at the northwest corner of Bos-
ton street and Lakewood avenue, in said city, the said
leasehold property being the same property which was
formerly used by Henry C. Chipman as a chair fac-
tory, said leasehold property to be free of all encum-
brances except the ground rent of two thousand dollars
($2,000.00) per annum. The principal of said loan
shall bear six' per cent. interest (6%) per annum,
payable quarterly, and said principal shall be payable
as follows: $5,000.00 in two years, $5,000.00 in four
years, and $30,000.00 in ten years, and said loan and
interest shall be evidenced also by the promissory notes
of George H. Chipman. Said Farmers and Merchants
National Bank further agrees that after it shall have
received its claims in full (which said claims are spe-
cially mentioned in, referred to and payable in the
manner set forth in the aforesaid agreement between
said bank and said Edward N. Rich), it will procure
an additional loan of $5,000.00 to be made to George
H. Chipman, said loan to bear six per cent. interest
per annum, payable quarterly, and to be paid off at a
period of five years from the date of the aforesaid
loan of $40,000.00, said loan to be secured by a sec-
ond mortgage, with the usual covenants, conditions
and agreements satisfactory to said bank on the afore-
said leasehold property, improvements, plant, machin-
ery, tools, furniture, fixtures and appliances, subject
only to the aforesaid ground rent and mortgage of $40,-
000.00, and said loan and interest shall be evidenced
also by the promissory notes of George H. Chipman.
The procuring of said loan is conditioned upon the

said Chipman complying with all the terms, covenants and conditions contained in the aforesaid mortgage to secure the sum of $40,000.00, and upon the said bank receiving its aforesaid claims in full at or before the expiration of one year from the date of the aforesaid loan of $40,000.00, which claims said George H. Chipman agrees to pay at or before said expiration, provided they shall not have been received under the aforesaid agreement with Edward N. Rich. The mortgage loans herein provided for are conditional upon the title to the leasehold property being guaranteed by the Title Guarantee and Trust Company."

To this agreement was attached the following guaranty executed by Henry C. Chipman on the same day:

"Whereas, the Farmers and Merchants National Bank has this day entered into an agreement with George H. Chipman to procure a loan of forty-five thousand dollars ($45,000.00); and whereas, said agreement was entered into at my request; and whereas, a condition precedent to the making of said agreement and the procuring of said loans is that this guarantee should be executed; now, therefore, in consideration of the premises and of the execution of the aforesaid agreement by the Farmers and Merchants National Bank of Baltimore, I hereby guarantee the repayment of any loans made under the said agreement, it being understood that this guarantee shall inure to and be made for the benefit of any person holding the notes evidencing said loans, it being further understood that recourse can be had against me immediately upon default in the repayment of any of said loans."

The agreement referred to in the above agreement between the bank and George H. Chipman as having been made by Edward N. Rich on the same day, after reciting the bankruptcy of Henry C. Chipman; that the claims to which we have referred had been filed against his estate, and the provis-

CHIPMAN vs. FAR. & MER. NAT'L. BK.    349

Md.]                    Opinion of the Court.

ions of the assignment by Washington Chipman and others
of their said claims to him, for the purpose therein stated,
as set out above, then proceeds as follows:

> "Now, therefore, this agreement witnesseth, That in
> consideration of the agreement this day entered into
> between the Farmers and Merchants National Bank
> and Geo. H. Chipman, the said Edward N. Rich hereby
> agrees to collect the dividends which may be finally
> audited and awarded to the aforesaid Washington
> Chipman, Mary C. Chipman, Emma G. Chipman and
> Jennie C. Dushane, and he further agrees, after the
> aforesaid Third National Bank shall have been paid
> out of the dividends so collected the balance due upon
> its claim, to pay all the balance of said dividends re-
> ceived by him to the aforesaid Farmers and Mer-
> chants National Bank until its aforesaid claim, amount-
> ing to $24,438.20, shall be paid in full with interest,
> as hereinbefore set out; no part of the amount paid
> to the aforesaid Farmers and Merchants National
> Bank by the said Edward N. Rich, shall be credited
> on account of the balance due to said bank by the afore-
> said Henry C. Chipman, bankrupt, and when the said
> bank shall have been paid its claim in full, it will
> assign to the said Edward N. Rich so much of the
> said claims as shall have been paid by him."

George H. Chipman became the purchaser from the trustee
in bankruptcy of the property formerly owned by his father,
Henry C. Chipman, consisting of the leasehold property,
plant, machinery, etc., constituting the factory referred to in
his agreement with the bank and the raw and manufactured
material on the premises, and on the 15th of September,
1906, he conveyed the same by mortgage, containing the
usual terms and covenants, to Edward Duffy of Baltimore
City, to secure the payment of a loan of $40,000.00, and
interest thereon at six per cent. per annum, and further evi-
denced by three promissory notes, payable to said Duffy, as
follows: One for $5,000.00, payable in two years; one for

$5,000.00, payable in four years; one for $30,000.00, payable ten years after date, and notes for the interest on said sums. On the 27th of October, 1906, the bank received from Edward N. Rich the sum of $7,438.10 and on February 27th, 1907, the further sum of $12,327.40, which sums, amounting to $19,755.51, with the dividends the bank received on its claims, paid in full its claim against the estate of Henry C. Chipman, and on the 6th day of April, 1907, George H. Chipman executed to Edward Duffy a second mortgage of said property to secure a further loan of $5,000.00 and interest at six per cent. per annum, for which he gave to said mortgagee his promissory note for $5,000.00 payable four years after date, and other notes for the interest on said principal sum. These notes and the notes secured by the first mortgage and the mortgages were assigned by the mortgagee to the Farmers and Merchants National Bank, and the proceeds of the bank's checks to the mortgagee for the amount of said loans were received by George H. Chipman. Henry C. Chipman having received his discharge in bankruptcy, he and George H. Chipman, on the 9th day of May, 1907, executed a guaranty to the bank, in which, after reciting that George H. Chipman had borrowed from Edward Duffy the amounts mentioned in the two mortgages; that George H. Chipman had carried on the business in the name of George Chipman & Son, and had used the money so borrowed in his business; that all the promissory notes referred to in said mortgages had been transferred by the mortgagee to the bank; that he, Henry C. Chipman, had or was about to enter into a partnership with George H. Chipman, and that George H. Chipman had requested the bank to transfer his account in said bank to the account of said partnership under the name of George Chipman & Son, which the bank had agreed to do on condition that they executed said guaranty; they "jointly and severally, both individually and as co-partners trading as George Chipman & Son," guaranteed the payment of and agreed to pay each of the promissory notes

CHIPMAN vs. FAR. & MER. NAT'L. BK. 351

Md.]                    Opinion of the Court.

described in said mortgages when they became due. After the execution of said guaranty the firm from time to time borrowed various sums of money from the bank until the sums so borrowed amounted, in August, 1908, to $6,900.00, for which the firm gave its note to the bank, and deposited with the bank, as collateral security for the note, forty-one shares of the capital stock of the Crown Cork and Seal Securities Company. At the time the stock was deposited with the bank, and before it was transferred to the bank, twenty-seven shares belonged to and was in the name of Emma G. Chipman, and the remaining fourteen shares belonged to Washington Chipman, and was in the name of George H. Chipman. One of the mortgage notes for $5,000 became due on the 15th of September, 1908, and was not paid, and the note of the firm for $6,900.00 became due on the 18th of September, 1908. The bank having refused to accept renewal of the note for $6,900.00, the firm offered to pay it and to take up the stock deposited as collateral, but the bank refused to surrender the stock on the ground that by the terms of the note the stock was not only pledged to secure the payment of the note, but also to secure "any other indebtedness or liability ascertained or contingent (joint or several) that the said firm might then be under or might thereafter incur" to the bank. The bank threatened to foreclose the mortgage, and Emma G. Chipman and Washington Chipman threatened to contest the right of the bank to hold the stock as security for other indebtedness of the members of said firm, whereupon, the said Emma G. Chipman, Washington Chipman, George H. Chipman, Henry C. Chipman and the bank, on the 6th day of October, 1908, entered into an agreement, in which, after setting out the excution of said mortgages and notes, the pledging of said stock as collateral security for the payment of said notes, and the threat of Emma C. Chipman and Washington Chipman to contest the right of the bank to hold the stock as collateral security for the payment of the mortgage notes, and

after reciting that it was entered into in order to avoid litigation, and in consideration of the mutual agreements therein, the said Emma G. Chipman, Washington Chipman, George H. Chipman and Henry C. Chipman agreed that the bank should hold said stock as collateral security for the payment of the notes mentioned in the mortgages and the note of $9,700.00 thereinafter mentioned, and any renewals thereof, and for any sums of money then or thereafter due the bank from George H. Chipman and Henry C. Chipman, or either of them, and the bank agreed to loan George Chipman & Son the further sum of $2,800.00 upon the delivery to it of the note of said firm for the sum of $9,700.00, covering the note of $6,900.00 and said additional loan, payable one year after date, with interest from date. The agreement also provided that the mortgage for $40,000.00 should not be foreclosed prior to September 15th, 1912, and further provided:

"that if the said George H. Chipman or Henry C. Chipman, either individually or as co-partners, trading as George Chipman & Son, shall fail to pay the note due September 15th, 1908, mentioned and described in the aforesaid mortgage dated September 15th, 1906, on or before Sepetmber 15th, 1909, or interest thereon from September 15th, 1908, to September 15th, 1909, quarterly at the rate of 6 per cent. per annum, or shall fail to pay the note due September 15th, 1910, mentioned and described in said mortgage, on or before September 15th, 1912, or interest thereon from September 15th, 1910, to September 15th, 1912, quarterly at said rate, or shall fail to pay any other note mentioned in either of the mortgages aforesaid as and when it falls due, or shall fail to perform the covenants, conditions and agreements of each of the said mortgages at the times therein limited, or shall fail to pay the aforesaid note of $9,700.00, or any renewals thereof, or the interest thereon as therein limited, or shall fail to perform any agreement herein contained, then upon such failure the agreement herein contained on the part of said bank not to foreclose

CHIPMAN vs. FAR. & MER. NAT'L. BK.  353

Md.]                    Opinion of the Court.

said mortgage of $40,000.00 prior to September 15th, 1912, shall become null and void, and the said note for $9,700.00, or any renewal thereof, shall immediately become due and payable, and upon such failure, or at any time thereafter, the said bank, or its president or cashier shall have full power and authority to sell, assign and deliver the whole or any part of said capital stock aforesaid, any substitutes therefor, or any additions thereto, or the property represented by the same, at any broker's board or elsewhere, at public or privtae sale, at his or its option, without advertising and without giving to said parties of the first part, or any of them, any notice, or making any demand for payment on any of the aforesaid notes herein mentioned or referred to, * * * the proceeds, after deducting all legal or other costs and expenses of sale or delivery, to be applied to the payment of any of the aforesaid notes herein mentioned or referred to, and then due and payable or matured," etc.

After the execution of the above agreement the firm of George Chipman & Son continued to borrow further sums from the bank to the amount of $14,000.00 which were secured by accounts receivable, and which were paid. In October, 1911, the note secured by the second mortgage became due and not having been paid, the bank, on the 16th of November, 1911, notified the firm that unless the notes secured by said mortgages and the note for $9,700.00 were paid on or before December 1st, 1911, the bank would sell the stock and foreclose the mortgages. On the 21st December, 1911, the bank instituted foreclosure proceedings and the property described in the mortgages was sold under a decree of the Circuit Court for Baltimore City in January, 1912, and purchased by a representative of the bank for $14,650. George H. Chipman filed exceptions to the sale, but before the exceptions were heard they were withdrawn and the sale was finally ratified by the Court, the bank agreeing that if the property was sold by the bank within a reasonable time

the mortgagor should receive credit for any advance in price over the sum for which it was previously sold. The bank subsequently sold the property for $20,000.00, and after crediting the advance realized from such sale, the amount still due the bank on the debts secured by said stock was about $33,000.00. On the 28th of May, 1912, the bank notified George H. Chipman, Henry C. Chipman, Emma G. Chipman and Henry C. Chipman, Administrator of Washington Chipman, that there was due on May 31st, 1912, on account of said notes $33,752.14, and that if the same was not paid on or before June 10th, 1912, the stock would be sold and the proceeds of sale applied to the payment of that sum. The amount due the bank was not paid, and, accordingly, the bank, on the 12th day of June, 1912, advertised the stock for sale on the 24th of June, 1912. Thereupon the appellants, Emma G. Chipman, Henry C. Chipman, George H. Chipman and Henry C. Chipman, Administrator of Washington Chipman, filed the bill in this case to enjoin the sale of the stock until the bank is authorized by the Court to make the sale.

The grounds upon which the bill was filed are: (1) that the loan of $45,000.00 was made by the bank, and that the bank was guilty of usury in exacting the payment of the debts due it by Henry C. Chipman to the amount of the $19,755.51, paid it by Edward N. Rich, and that that sum, with interest, should be allowed as a credit on the mortgage debt; (2) that the mortgages are void under the Act of 1894, Chapter 629, Code of 1904, Article 23, section 112; (3) that under the United States statutes, relating to usury, no sum of money is due the bank; and, (4) that at the time the bank foreclosed the mortgage of 1906 the mortgage debt was not due, and that the bank by foreclosing said mortgage broke the agreement of October 28th, 1908, and cannot, therefore, hold the stock as security for the loans therein referred to.

We have stated fully the case as presented by the pleadings and evidence in order to show the circumstances under which the questions to be determined arise.

Learned counsel for the appellants very forcibly and earnestly contends that the record shows that notwithstanding the loans were made in the name of Edward Duffy they were in fact made by the bank, and that the bank was guilty of usury in exacting, in addition to six per cent. interest, the payment of the debts due it by Henry C. Chipman, bankrupt.   But even if we assume that the loan was made by the bank, and that it exacted something more than legal interest, that alone would not be sufficient to support the contention of the plaintiffs for the allowances claimed.   The effect of usury under the laws of this State is not to render the contract *void*, but the borrower may in law or equity recover the amount paid by him in excess of the interest allowed by law, or he may when sued on an usurious contract be allowed such excess.   *Scott* v. *Leary,* 34 Md. 389.   Usury laws are, however, enacted for the protection of the *borrower* from oppressive demands of the lender, and it is only from excessive burdens imposed upon the *borrower* that relief is afforded.   In this case the allegations of the bill are, and the record shows that the claims of the bank against Henry C. Chipman, bankrupt, were paid by Emma G. Chipman, Washington Chipman, Mary C. Chipman and Jennie C. Dushane. They were not paid by George H. Chipman, the borrower, and there is no evidence in the case to show that they were paid at his request.   On the contrary, the evidence tends to show that those payments were made at the instance of Henry C. Chipman.   He says in his testimony that the claims of his family against his estate were assigned to Mr. Rich to pay the bank in order to assist him, and in the guaranty attached to the agreement between the bank and George H. Chipman he stated that that agreement was made at his request, and because of that fact he guaranteed the payment of the sums mentioned in said agreement.   The agreement signed by Edward N. Rich provided that after the payment of the bank's claims they should be assigned by the bank to Mr. Rich to the extent that he had paid them out of dividends

belonging to Emma C. Chipman and others, and immediately after Henry C. Chipman reecived his discharge in bankruptcy he entered into a partnership with George H. Chipman and they conducted the same business that he was engaged in at the time he was adjudged a bankrupt. There is no principle upon which George H. Chipman can claim an allowance for what he has not paid, and third parties liable for his debts can demand only such credits as he is entitled to receive. As between the bank and Emma G. Chipman and Washington Chipman, and apart from the connection of Emma G. Chipman and Washington Chipman as owners of the stock with the debts now due the bank, the claims of the bank against Henry C. Chipman, bankrupt, were voluntarily paid, and they have no cause of action against the bank for the amounts so paid by them. On the other hand, if we treat said claims as having been paid by Henry C. Chipman, he would not be entitled to recover what he was under a moral obligation to pay. *Wilson* v. *Russell,* 13 Md. 494; 39 *Cyc.* 985. We have examined the cases cited by counsel for the appellant, and while in this State and elsewhere the Courts have repeatedly held that relief may be had from usurious demands regardless of the device resorted to by the lender, we know of no case holding that the borrower can recover what he has not actually paid, in the absence of some statute authorizing him to do so. In the case of *Baugher* v. *Nelson,* 9 Gill, 308, the Court said: "It is established that if the borrower has paid money upon an usurious contract, both the Courts of law and equity will enable him to recover back the excess paid beyond the principal and lawful interest, but no further," and in the case of *Scott* v. *Leary, supra,* JUDGE MILLER, after quoting the above statement in *Baugher* v. *Nelson,* says: "The reasons upon which this doctrine is found are stated by LORD MANSFIELD, in *Browning* v. *Morris,* 2 Cowp. 792, and 3 *Parsons on Cont.* 128, where it is said: 'The distinction has been taken between statutes enacted on general grounds of policy and public expediency in which

each party violating the law is *in pari delicto* and entitled to no assistance from a Court of justice, and those laws enacted to protect weak or necessitious men from being overreached, defrauded or oppressed, in which event the injured party may have relief extended to him, and the whole purport and reason, both of the law of usury and of the great mass of decisions under it, indicate that the lender on usury is regarded as the oppressor and the criminal, and the borrower as the oppressed and injured.' "

While the "lender on usury" is no longer regarded as a criminal in this State, and his contracts are not made void, the principle upon which the borrower is allowed his remedy is that he is the victim of oppression.

If the question of usury in this case is to be determined in accordance with the laws of this State, it is quite clear that the plaintiffs are not entitled to an allowance of the amount paid to the bank in settlement of its claims against the bankrupt estate of Henry C. Chipman. If the United States Statutes are to control, the same result must follow. Section 5197 of the Revised Statutes authorizes national banks to charge interest "at the rate allowed by the laws of the State," and section 5198 declares that "The taking, receiving, reserving or charging a rate of interest greater than is allowed by the preceding section, when knowingly done, shall be a forfeiture of the entire interest which the note, bill or other evidence of debt carries with it, or which has been agreed to be paid thereon. If the greater rate of interest has been paid, the person by whom it has been paid, or his legal representatives, may recover back in an action, in the nature of an action of debt, twice the amount of the interest thus paid from the association taking or receiving the same; provided, such action is commenced within two years from the time the usurious transaction occurred." If we regard the amounts paid by Mr. Rich to the bank, in 1906 and 1907, as usurious interest on the mortgage notes, there would be no redress for the plaintiffs in this case, for

358 CHIPMAN vs. FAR. & MER. NAT'L. BK.

Opinion of the Court. [121

according to the Supreme Court's construction of section 5198, the remedy therein provided, when the interest has been paid, is the exclusive remedy, and the action must be commenced "within two years from the time the usurious transaction occurred." *Hazeltine* v. *Cent. Bank, etc.,* 183 U. S. 132; *Schuyler Nat. Bank* v. *Gadsden,* 191 U. S. 451; *Lazear* v. *Nat. Union Bank,* 52 Md. 78. Independent, then, of other considerations, it is apparent that the plaintiffs are not entitled to a credit for the amount paid on account of the bank's claims against the bankrupt estate of Henry C. Chipman.

We think it equally clear that the mortgages in this case are not void under the Acts of 1894, Chapter 629. That Act was construed by this Court in *Commercial Assn.* v. *Mackenzie,* 85 Md. 132, and held not to apply to mortgages on real or leasehold property. It is true, the mortgages in this case do convey some personal property in addition to the leasehold property therein described, but the evils that Act was intended to remedy, and the reasoning of the Court in *Mackenzie's case* excludes the idea that that is sufficient to render the mortgages void. The amount of the personal property is not shown, and may be of comparatively little value as compared with the leasehold property. The mortgages are in the usual form, specify the debt and interest to be paid, provide that the mortgagor shall remain in possession of the property until default, were duly recorded, and could not be foreclosed except through legal proceedings. It is evident that they do not come within the class of contracts the statute condemns. The language of the Act does not require and the wrongs sought to be avoided do not suggest a different construction. By its terms the Act is expressly limited in its application to loans on "chattels," and we can not hold that it strikes down the mortgages in this case, covering both leasehold and personal property.

Nor do we think the record sustains the remaining contention of the appellants, that the bank broke the contract of

October 28th, 1908, by foreclosing the first mortgage before the notes thereby secured became due, and that, therefore, it is not entitled to hold the stock as security for the mortgage debt. The contract did not in terms extend the time for the payment of the first mortgage notes, but provided that if they were not paid on or before the dates therein mentioned, or if the other notes therein referred to were not paid when due, then the agreement that said mortgage should not be foreclosed before 1912 should be void. The failure to pay the second mortgage note when due avoided the agreement in reference to the foreclosure of the first mortgage, and the note due September, 1910, being overdue, under the terms of the mortgage, the bank was authorized to foreclose. It is suggested in the bill that the circumstances under which the bank obtained the stock in question disentitles it to hold the stock as security for any of the notes except the firm note for $9,700.00. Whatever may have been the right of the bank under the original deposit of the stock, after the agreement of October 28th, 1908, entered into for the purpose of adjusting the claims of the plaintiffs and the bank, and in consideration of the agreements contained therein, and a further loan to the firm of George Chipman & Son, there was no longer any room to question the right of the bank to hold the stock as security for the mortgage notes.

As the bank has not received as usurious interest any sum that the plaintiffs are entitled to have deducted from its mortgage claim in this case, and as the bank is entitled to sell the stock, in accordance with the terms of the agreement of 1908, for the purpose of paying the debts therein referred to, and as provided therein, we must affirm the decree of the Court below.

*Decree affirmed, with costs.*