# THE COMMERCIAL BUILDING AND LOAN AS-SOCIATION OF RICHMOND, VIRGINIA, *vs.* GEO. N. MACKENZIE AND WILLIAM H. COSTER, TRUSTEES OF WM. McCARTY.

*Building Associations—Usurious Loan by Foreign Building Associa-tion on Leasehold Property—Construction of Act of 1894, Chap. 629—Securities for Usurious Loan on Chattels Null and Void—Money Paid by Building Association for Redemption of Shares of Stock—Building Association Mortgages—Sale upon Default.*

The Act of 1894, chap. 629, provides that no corporation doing busi-ness in this State shall make any loan on the security of chattels or otherwise, except in its own proper name, &c., and shall not charge more than six per cent. interest, and that any contract in violation of the statute shall be null and void. It was provided that the Act should not apply to building associations incorporated under the laws of this State. *Held*, that since the obvious purpose of the Act was to prohibit the exaction of usury by lenders on the security of chattels and to protect borrowers on such security, the word mort-gage not being used in the Act, the same is applicable only to loans upon the security of chattels, and does not apply to a loan by a for-eign corporation on leasehold property so as to render a mortgage on the same, providing for the payment of interest at a higher rate than six per cent., absolutely void, and not merely void as to the excess over the legal interest.

In the construction of a statute the intention of the Legislature is to prevail, and is to be collected from the whole of the law and the cir-cumstances that produced it.

The money paid by a building association for the purchase or re-demption of shares of stock is not a loan to the shareholder to be repaid by him with interest, and therefore the question of usury does not arise in the transaction. Although the principal sum advanced is not to be regarded as a loan or debt, yet the payments to be made from time to time for dues, premiums, fines, penalties and in-terest on the money advanced for redemption of the shares may be secured by a mortgage and the sum so secured must be paid in like manner as other debts.

A mortgage to a building association provided for an advance in Sep-tember to the mortgagor member of $2,000 on sixty shares of stock,

and an additional advance of $4,000 in November. The mortgagor was bound to pay the dues, premiums, &c., and interest at the rate of 50 cents a month on each of the sixty shares of stock. *Held,* that since interest was to be paid on $6,000 from September, while the full amount was not advanced until November, this was usury, and the mortgagor is entitled to a rebate.

A provision in the by-laws of a building association provided that loans on real estate might be repaid at any time on thirty days' notice, and that if a borrower thereon neglects to pay any interest, dues or monthly payments for the period of three months from the time the same shall be due, then the whole principal mentioned in the mortgage shall become due and proceedings may be commenced forthwith to foreclose said mortgage. *Held,* that this by-law refers only to loans made to borrowers where there is an obligation to repay the same with interest, but that where money, secured by mortgage, is advanced by the association, not as a loan, but in redemption of shares of stock, and it is provided in the mortgage that a sale may be made after default for one day in any of the conditions, then a sale may be had in case of such default.

Appeal from an order of Circuit Court No. 2, of Baltimore City (HARLAN, C. J.), sustaining exceptions to the mortgage sale reported in this case and declaring the mortgage to be null and void. The exceptions filed by the appellees were as follows :

*First.*—That on the 2nd day of March, 1895, the said William McCarty made to your exceptants a deed of trust for the benefit of creditors, as will appear from the copy of said deed filed in this Court in the *exparte* matter of William McCarty, a petition in which cause was filed on the 3rd day of March, 1896, asking this Court to assume jurisdiction of the said trust, and this Court, prior to the filing of the petition for foreclosure or the signing of the decree in this cause, assumed jurisdiction as aforesaid, by its order passed on the said 3rd March, 1896.

*Second.*—That the complainant, the Commercial Building and Loan Association of Richmond, State of Virginia, appears to be a foreign corporation, and may be properly incorporated, though these exceptants have no knowledge on the latter subject, and therefore neither admit nor deny the due and proper incorporation of the said association, asking

that the said plaintiff be required to prove the same and file in this cause a certified copy of its charter.

Yet, whether properly incorporated or not, said corporation is subject to the laws of this State, so far as the loan and mortgage in this cause are concerned, and it appears from the said mortgage that its terms are directly in conflict with section 104, Article 23, Public General Laws, known as chapter 629, Acts of Assembly, 1894, in force from the date of its approval, to-wit, April 6th, 1894, for these exceptants hereby show to the Court that the said corporation required the said William McCarty to agree in said mortgage " to pay the mortgagee or its assigns, on the 25th day of each month, on each of said sixty shares, the sum of sixty cents dues, fifty cents premium and fifty cents interest, until the whole amount of money so advanced to him by said body corporate is liquidated by the maturity of said stock, wherefore the said mortgage is null and void, as these exceptants insist.

*Third.*—That the property in this cause consists of six dwelling houses fronting on Carroll avenue 25 feet to an alley and a vacant lot in the rear of the said lots of about the same dimensions as the entire six lots aforesaid, all of which said lots covered by the dwellings aforesaid, and the large vacant lot in the rear could have and should have been sold separately, as by such sale a much larger sum would have been realized for the said property.

Yet, the said trustee did not sell the said property separately, but sold the same in bulk, in consequence of which it was bought in at a very small and inadequate price by and on behalf of the mortgagee, as these exceptants have been informed and believe, and as they accordingly charge.

*Fourth.*—These exceptants further show, that even if the said plaintiff had the right to make the said loan, yet, under the terms of the by-laws of the said association, one of which is as follows :

Art. IX, sec. 6.—" Loans on real estate may be repaid at any time on thirty days' notice. If a borrower thereon

neglects to pay any interest, dues or monthly payments for a period of three months from the time the same shall be due, or if he neglects to pay his insurance, taxes or assessments on the day that they fall due, then the whole principal mentioned in the mortgage and note or bond shall at once become due and payable without notice, and proceedings may be commenced forthwith to foreclose such mortgage, or collect said bond or note in such manner as the board of directors may deem best."

The said association had no right to enforce a sale after one day's default, as in said mortgage stated, but could only sell after a default had been made in payment of interest, dues or monthly payment for ninety days, and in this case no such default existed, as will appear from the statement of mortgage claim filed in this cause; and further, these exceptants show that all insurance, taxes and assessments had been and were paid by the said William McCarty, so that under the clause of said by-laws referring to insurance, taxes and assessments no right to sell existed.

And further, the exceptants show that according to said statement of mortgage claim filed by the complainant, no default on the part of the said McCarty appeared, but that the amount of his indebtedness, if the same is to be treated as a debt, can only be made to appear in default by charging against him the unlawful exaction of a premium on the loan mentioned in these proceedings.

Wherefore these exceptants ask that the same sale may be set aside, and that the mortgage may be declared null and void, and that they may have such other and further relief as their case may require.

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, PAGE and BOYD, JJ.

*Archibald H. Taylor* and *E. P. Keech*, for the appellant.

*Thomas Mackenzie* (with whom were *John V. L. Findlay* and *Wm. H. Coster* on the brief), for the appellees.

BRYAN, J., delivered the opinion of the Court.

William McCarty executed a mortgage on certain lease-hold property in the city of Baltimore to the Commercial Building and Loan Association of Richmond, Virginia. The mortgagee is a body politic and corporate under the laws of Virginia. By due proceedings the mortgaged property was sold, and in regular course exceptions were filed to the ratification of the sale. The second exception maintains that according to the Act of 1894, chapter 629, the mortgage is null and void. As this exception goes to the root of the whole matter, it is best to consider it before giving our attention to other subordinate questions which have been argued at the bar. The specific objection is urged against this mortgage that it exacts interest at a greater rate than six per cent. *per annum*; and it is said that it is embraced within the Act of 1894, chapter 629. If these objections are well founded they are fatal to the mortgagee's case; because the Act in question makes the usurious contracts and securities therein mentioned absolutely null and void. It cannot be denied that a verbal and literal interpretation of the language of the Act will sustain the objection which has been urged. The appellant, however, argues that the purpose and meaning of the Act, the object which it was intended to accomplish, the evils designed to be remedied, and the great mischiefs which would be caused by including within its provisions such mortgages as the one now in litigation; all show that the construction set forth in the objection must be erroneous. A diligent examination of the Act is required for the decision of this question, which is involved in considerable difficulty.

When a written instrument of any character whatsoever is brought before a Court for adjudication, the first inquiry must be directed to its meaning. Until this is ascertained every step in the proceeding must be futile and useless. A great number of rules have been evolved by the wisdom and experience of successive ages for ascertaining the mean-

ing of statutes, deeds, wills and contracts. No general
rules have ever been devised which are adapted to all cases,
and it is not possible in the nature of things that any can
ever be devised. They are, however, helpful in legal
studies. But of some of them, it may perhaps be suggested
that they are more useful in illustrating and explaining a
result when it has been attained, than in helping forward
the investigation by which it is to be established. Courts
must ascertain the meaning of written instruments when it
is possible for them to do so ; seeking the aid of all rational
methods of interpretation. Words and phrases are often
used carelessly and inaccurately, sometimes it is evident
that they are intended to include objects which are not
expressed, and sometimes to exclude others which are em-
braced within their usual and ordinary signification. BLACK-
STONE mentions some ancient instances where the literal
meaning of the words used would have defeated the evident
intention of the statute. For instance, the law cited in *Puf-
fendorf*, which made it punishable for a layman to *lay hands*
on a priest, was held to extend to a man who had hurt a
priest with a weapon. Here a penal statute clearly included
a case which was not within its literal terms. Also, another
law from *Puffendorf* which enacted that "whoever drew
blood in the streets" should be severely punished. It was
adjudged that it did not apply to a surgeon who opened a
vein to relieve one suffering from a fit. Also, a case from
a treatise attributed to Cicero, where a law was cited which
enacted that those who forsook a ship in a storm should
forfeit all property on board, and that the ship and lading
should belong exclusively to those who stayed in it. Dur-
ing a tempest every one forsook the ship except one sick
passenger who, because of his infirmity, was unable to
escape. By chance the vessel came safely to a port. The
sick man being in possession, claimed the benefit of the law.
It was adjudged that the object of the law was to reward
persons who should venture their lives, to save the vessel,
and that the sick man was not within its meaning ; inasmuch

as he remained in the vessel because he had not the power to get away, and not with the intention of saving it; nor did he contribute in any way towards its preservation. In these two latter instances the construction of the statute excluded cases which were comprehended within its words. In *Lyde* v. *Barnard*, 1 Meeson & Welsby 101, the Judges of the Court of Exchequer were divided on the construction of an Act of Parliament. One of them thought that certain words in the Act ought to be transposed; two of them thought it highly probable that this would meet the difficulty; while LORD ABINGER thought that a word ought to be rejected altogether. In many cases, both in England and this country, words have been altered and supplied when the intention required it. If we come down to a very recent date we find in our own Court cases illustrating the principles by which we must interpret and construe written instruments. In *Byrne* v. *Gunning*, 75 Md. 35, phrases were transposed and words were inserted in order to express the meaning of a deed. In *Farrell* v. *Mayor*, 75 Md. 493, it was held that the word "*damages*" should be substituted for "*benefits*" and in this way the literal meaning of a paper was entirely reversed. A case was cited in the opinion of the Court where a written promise "*not to pay*" was held to mean a promise *to pay*. And other remarkable cases were mentioned. One of them required the Court to determine the meaning of the transcript of the record in a capital case; and it determined that " Baltimore County " was to be read " Carroll County." In *Burnett* v. *Bealmear*, 79 Md. 39, a receipt for payment in distraint proceedings was disregarded altogether. It was evidently a clerical misprision, and the Court said that it was " bound to ascertain the true meaning of the paper even in direct opposition to the terms employed." Other striking cases are *Lewis* v. *Fisher*, 80 Md. 142; and the *American Casualty cases*, 82 Md. 535. And we must not forget to mention *Trinity Church case*, 143 United States, 458. These authorities and many others which might be cited show how

readily the Courts will brush aside the language of an instrument when it stands in the way of its meaning.   We are fully aware that the cases cited are well known ; and we have not quoted them from any impression that they declared a doctrine in any respect unfamiliar.   But we wished to have them impressed upon our minds as we considered the construction of the statute which is now before us.

The title indicates that it is an additional section to the laws relating to "Building or Homestead Associations."   But there is no reference whatever to these associations except in the last two lines.   Of this matter we shall speak hereafter.   In the body of the Act it is stated : "And that no corporation incorporated under the laws of this State, for any purpose whatsoever, nor any foreign corporation doing business in the State, shall offer to procure or act as agent for any person or persons in procuring or making any loan of money or other valuable thing on the security of any chattels, nor shall make any loan of money or of any other valuable thing on the security of any chattels or otherwise, except in its own proper corporate name and for its own behalf or benefit ;" and that no such corporation shall charge more than six per cent. interest on any loan ; and that every security taken by any such corporation for a loan shall express plainly the period of time for which it is made and the entire interest agreed to be paid for the term of its continuance, and that any contract or security made in violation of the statute shall be absolutely null and void ; and that no person shall, under a specified penalty, assume to deal or act as a corporation, or in any corporate name, or in any other than their own proper names in any of the matters prohibited by the statute ; and that every security taken by such persons in any other than their own proper names shall be absolutely null and void.   And finally, it is provided that the Act shall not apply to homestead and building and loan associations incorporated under the laws of this State. It is shown on the face of the Act that it is directed against certain conduct by corporations, and against persons who

had assumed to deal and act in a corporate name.    It pro-
hibits a corporation from acting as agent in procuring or
making loans of money or other thing of value on the
security of chattels, and from making loans on the security of
chattels or otherwise except in its corporate name and for
its own benefit; and it provides punishment for any indi-
vidual who shall use a corporate name for doing any of the
things which a corporation is forbidden to do.    And it
makes contracts which are forbidden by the Act null and
void; and it provides even in cases where contracts may be
authorized by the Act, that they shall be void if usurious
interest is exacted.    The Legislature was striking at an evil
which had grown to be very oppressive to persons whose
necessities put them in the power of usurers.    The means
by which the oppression was practiced are described in the
Act.    Certain corporations assuming to act as agents for
others loaned money on chattel security at excessive rates
of interest; and certain individuals did the same things in
the name of corporate bodies which had merely a fictitious
existence.    There was naturally great complaint because of
the extortions and impositions practiced on the helpless suf-
ferers.    And there was a general belief that there was much
fraud and imposition cloaked and concealed under the pre-
tence of agency.    The remedy adopted by the Legislature
was to prohibit the disguises assumed by real corporations,
and to punish as a crime the false assumption of a corporate
name by individuals.    And also to make their usurious con-
tracts void.    If we look carefully through the Act we will
see that its prohibitions are levelled against conduct which
in the ordinary course of things is not practiced by lenders
of money on real or leasehold property, and which could
not be practiced by them without inconvenience and detri-
ment to themselves.    It is not usual for either corporations
or individuals to take mortgages in the names of other per-
sons.    The most ordinary prudence induces them to keep
such investments in their own names and under their own
control.    And there is no language in the Act which is

especially applicable to mortgages; it speaks of "contract or security" for loans, but never in any instance uses the word "mortgage." And it is well to bear in mind that mortgages on real and leasehold property could not be enforced except through legal proceedings, wherein any excess over legal interest could readily be abated; whereas, chattels in the possession of the lender could more readily be disposed of and excessive interest more easily received, and all responsibility for it more easily evaded. Nor was there any great evil committed by corporations, which loaned money on mortgages of real and leasehold property, such as the Legislature were called upon to correct. With the exception of two words which will presently be noticed, all the language of the Act is specially adapted to loans on the security of chattels, while no language is used which is ordinarily employed in speaking of debts secured by liens on real or leasehold estate; that is to say, the word "*mortgage*" does not appear in the Act. In the beginning of the Act it is stated that no corporation "shall make any loan of money  *   * on the security of any chattels *or otherwise*, except in its own proper corporate name and for its own benefit." Now, if the legislative meaning is that corporations shall not lend on chattel security or in any other manner, except, &c., this clause taken in connection with the subsequent parts of the Act, will make absolutely null and void every loan of money by a corporation where more than six per cent. interest is charged ; the entire debt, principal and interest, is forfeited. For nearly fifty years the excessive interest only was forfeited, but the principal could be collected. The supposed change in the methods of business will be very great. There will be a complete reversal of the customs and dealings which have grown up under the Act of 1845, chapter 352. As far as is known to the Court there is no complaint that wrongs and oppressions have been practiced under that Act, or that they could be practiced. We have very frequently been called upon to apply it, and we have not heard it alleged that it was not wise, just and beneficent in its oper-

ation.   The principal evil of usury is when it is concealed; when it is brought before a Court under the Act of 1845 redress is readily obtained.   A question must be answered whether the Legislature would make so great a revolution in the law, simply by using these little words " or otherwise."   Moreover, let us be told why they should make such a change by means of a statute whose caption gives no intimation of such a purpose, and whose tenor and general purport cannot be said to express it with any certainty.  On the other hand it may be asked whether we ought not to suppose that the Legislature had the specific intention of abolishing the abuse which was producing such enormous evil, and which under specious pretences had successfully eluded correction.   The words of the statute would appropriately express this intention; and if such is its meaning, it will not be necessary to give to the words " or otherwise " the extended meaning attributed to them by the appellee.   A simple transposition and the addition of the word " than " will bring all parts of the statute in harmony.   The clause in question will then read as follows:  " No corporation shall make any loan of money, or of any other valuable thing on the security of any chattels, except or otherwise than in its own proper corporate name," &c., &c.   After full consideration we think that the Act does not apply to any securities except those which bind chattels.   The closing words of the statute exempt from its operation homestead and building associations incorporated under the laws of this State.   These associations were authorized to accept the hypothecation of their stock to secure the payment among other things of the interest on the money which might be advanced for the purchase or redemption of shares.   Article 23, sections 98 and 99 of Code, and Act of 1894, chapter 321.   The exemption in the statute protected these associations against a construction which it was probably supposed might be put on the terms " security of any chattels."

This is an appropriate time to notice a misapprehension

which has prevailed to a considerable extent on the subject
of the liability of a building association for usurious inter-
est.   The powers of these associations were originally con-
ferred by the Act of 1852, chapter 148.   They have been
slightly modified in some respects by sections 95, &c., &c.,
of Article 23 of the Code, and the amendments made by
the Act of 1894, chapter 321.   The money paid by an as-
sociation of this kind for the purchase or redemption of
shares of stock is not a loan to the shareholder to be repaid
by him with interest, and therefore the transaction is not
one to which any question of usury could be applied.   But
although the principal sum advanced is not to be regarded
as a loan or debt; yet the payments to be made from time
to time for dues, premiums, fines, penalties and interest on
the money advanced for redemption of the shares may be
secured by mortgage on real and leasehold property; and
the sums so secured must be paid in like manner as other
debts.   And the interest to be paid on the sum advanced
is fixed at six per cent. by section 99 of Article 23 of the
Code.   The same learned Judge who delivered the opinion in
*Robertson's case*, 10 Maryland, 397, which established the law
in regard to these associations, also delivered the opinion in
*Thursby's case*, 58 Md. 284.   He calls attention in *Thursby's*
*case* to the difference between it and *Robertson's case*.   Rob-
ertson's mortgage bound him to pay monthly as long as
the society endured six per cent. on the sum advanced for
redemption of his shares.   But Thursby's contract was to
pay a greater rate of interest than six per cent. on the sum
advanced.   Of course the amount paid for excessive inter-
est was abated.   In the present case it appears from the
mortgage that McCarty on the twenty-fifth of September,
eighteen hundred and ninety-five, received an advance of
two thousand dollars on sixty shares of stock, and that the
Commercial Building and Loan Association had agreed to
advance the additional sum of four thousand dollars, which
was to be paid at different times in October and November
of the same year.   The mortgage was in the usual form

binding the mortgagor to pay the dues, premium and interest until the whole amount of money advanced should be liquidated by the maturity of the stock; and also to pay ground rent, taxes, fines and insurances. But there was no covenant to repay the sum advanced, or any portion of it. The transaction was not a loan of money to him, but a redemption of his shares of stock by the association. The interest to be paid was fifty cents a month on each of the sixty shares of stock, and by the proper construction of the mortgage the interest was to be computed from its date. He was therefore charged with the interest on six thousand dollars, when he received at the time only two thousand dollars, and when the whole amount of the advance was not completed until the latter part of November. This was usury. And although in the statement of the mortgage claim there was the proper rebate of interest; nevertheless the statute which we have been considering enacted that the charging of usurious interest should make the contract or security absolutely null and void. This result will incidently illustrate the hardship of the construction which has been maintained by the appellees.

The fourth exception alleges that according to the terms of Article IX, section 6 of the by-laws, the association had no right to enforce a sale at the time it was made. This section refers exclusively to loans made to borrowers; that is, to cases where there is an obligation to repay the sum with interest as a debt, and not to advances made on redeemed shares. In the case of the *Mattress Company*, 82 Maryland, 513 and 514, we endeavored to show the difference existing between the two transactions. The present mortgage shows unequivocally that there was no loan of money; that the money advanced was not to be repaid by the mortgagor; that the money was advanced in redemption of the stock, and that the monthly payments were to be continued until the whole amount of money advanced should be liquidated by the maturity of the stock; and that no obligation was incurred by the mortgagor, ex-

cept by the covenants in the mortgage.    And it was ex-
pressly agreed in the mortgage that the sale might take
place after a default in any of its conditions  had continued
for one day.    The sale was made on the sixth day of April,
eighteen hundred and ninety-six ; at that time the  mortga-
gor had been  in default longer  than  the required  period.
He had also become insolvent and had made an assignment
to trustees for the  benefit of his  creditors.    The trustees
are the exceptants in this case.    Without extending this
opinion further, we think  it sufficient  to say that we have
fully considered the other  exceptions  to the  sale, and do
not think that they ought to be sustained.

   The learned Court below declared the mortgage null and
void and set the sale aside.    It has been  seen  that we are
not able to agree in this opinion.    We will  reverse  the
order and ratify the sale with costs in both Courts.

*Reversed  and sale ratified.*

(Decided February 18th, 1897.)