LE SUEUR et al. v. MANUFACTURERS' FINANCE CO.*

(Circuit Court of Appeals, Sixth Circuit. December 5, 1922.)

No. 3666.

1. Courts ⬳354—Decree against plaintiff, ordering reference on counterclaim, held within court's control after term.

Under equity rule 30 (201 Fed. v, 118 C. C. A. v) providing for counterclaims and for the entry of final judgment in the same suit, both on the original and cross claims, a decree adjudging plaintiff not entitled to recover, and ordering a reference on a counterclaim, was still within the court's control, and not final, in the sense that the court could not set it aside after the term, especially where the counterclaim arose out of the transaction which was the subject of the bill.

2. Usury ⬳16—Ostensible contract for sale of accounts held contract for loans at usurious interest.

A contract ostensibly providing for the sale of accounts at discounts, dependent on the time of payment, and for payment of 80 per cent. of the face value at the time of the sale, less an agreed charge, and for repurchase by the seller at full face value of any accounts defaulted, held merely a cover for loans at usurious rates of interest.

3. Pledges ⬳2—Contract for loan on accounts held governed by laws of state where lender had principal place of business as provided.

Where contract providing for the making of loans on assigned accounts as security stated that it was entered into at Baltimore, Md., and was to be construed and interpreted in accordance with the laws and decisions of Maryland, in which the lender had its principal place of

---

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 43 Sup. Ct. 432, 67 L. Ed. —.

business, it was a Maryland contract, and to be construed according to the laws of that state, though prepared and signed by the borrower at Nashville, Tenn., and forwarded to Baltimore, where it was executed by the lender and a copy sent therefrom to the borrower.

4. Pledges ⚖️2—Competent for parties to agree that laws of particular state should govern construction.

It was competent for the parties to a contract providing for the making of loans on assigned accounts as security effectually to agree that its construction should be governed by the laws of Maryland, where the lender had its principal place of business.

5. Pledges ⚖️2—Assignments of accounts held governed by laws governing contract under which made.

Where contract whereby plaintiff agreed to make loans to defendant on assigned accounts as security provided that it was to be governed by the laws of Maryland, and that only accounts acceptable to plaintiff would be taken, and that defendant should assign the accounts, and assignments thereafter made referred to the previous contract, the assignments *held* a continuous and connected series of transactions in performance of the original contract, and governed by the laws of Maryland.

6. Pledges ⚖️2—Assignments of accounts as security held completed in lender's state.

Where, in carrying out contract for loans on accounts assigned as security, the borrower transmitted lists of accounts, which the seller copied into a printed form of assignment and sent to the borrower for execution and return, and on receipt of the formal certificate the acceptance was signed by the lender, the execution of the assignments was completed in Maryland, where the lender had its place of business, whether the acceptance was made when the assignments were forwarded to the buyer, or when the signature to the acceptance was formally attached.

7. Usury ⚖️79—Loan on assignment of accounts invalid only to extent of excessive interest.

Under the Maryland statutes, usurious contracts of loan are invalid only to the extent of the interest in excess of 6 per cent., except in the case of loans by corporations on chattels, and a loan on the security of assigned accounts is not within the exception.

8. Corporations ⚖️659—Corporation held estopped to urge statute as to doing business as defense to recovery against it.

Where a contract to make loans on assigned accounts authorized the corporation borrower and its president to collect assigned accounts as agents of the lender, and made it their duty to transmit the proceeds to the lender, the borrower was estopped to set up a statute relative to the doing of business by foreign corporations as a defense to recovery on account of collections made.

9. Corporations ⚖️659—Corporate borrower's liquidating committee held estopped to set up statute to defeat recovery of amounts collected on assigned accounts.

Where contract to make loans on assigned accounts authorized borrower, a corporation, to collect the accounts as lender's agent, and committee appointed to liquidate the corporation agreed to forward all amounts collected without prejudice to the right to set up usury, the liquidating committee *held* estopped to set up a statute relative to the doing of business by foreign corporations as a defense to the recovery of amounts collected, though the collections were made after it had decided to deny the lender's right thereto because of usury, as it occupied a fiduciary relation toward the lender, and, if not the lender's agent, was the representative of the borrower.

10. Indemnity ⚖️11—Pledgee of accounts held not to have agreed to return collections until contract found bad.

Where corporation assigning accounts as security for loans under agreement that it might collect became financially involved, and a liquidating

committee was appointed, which agreed with it and the lender to remit collections on assigned accounts to the lender, without prejudice to the right to set up usury, and the lender agreed to execute a bond to secure moneys payable by it on account of such remittances in case the original contract should be held usurious, the lender *held* not to have agreed to return collections remitted by the committee unless or until its contract was found bad.

11. **Corporations ☞623—Cost of collecting assigned accounts by insolvent assignor's liquidating committee to be deducted from the collections.**

Though contract to make loans on the security of assigned accounts provided that the borrower, a corporation, or its president, might collect the assigned accounts at their own expense, as the lender's agent, where the borrower was insolvent, and the cost of collections made by a liquidating committee would come out of general creditors, unless deducted from the amounts collected, it should have been allowed the cost of the collections out of the moneys collected.

12. **Corporations ☞623—Assignee of accounts held not entitled under agreement to charge premium on bond against assignor's liquidating committee.**

Where corporation assigning accounts as security for loans became financially involved, and liquidating committee collected accounts and remitted collections to the lender, under agreement that bond should be given to secure repayment, and that the premium should be paid by the lender if the contract should be held usurious and moneys decreed paid by it to the borrower, and that if the contract was not held usurious the borrower should pay the premium, and the contract was held usurious, but no moneys were decreed to be paid by the lender to the borrower, the lender, as the party giving the bond, was bound to pay the premium.

13. **Costs ☞60—Divided where plaintiff did not recover on theory of bill and recovered less than sued for.**

Where plaintiff, contracting ostensibly to purchase accounts, sued the seller of the accounts and a liquidating committee for amounts collected by them, but recovered, on the theory of a loan at usurious interest, only the amount loaned, with simple interest, the costs *held* to be divided equally.

Appeal from the District Court of the United States for the Middle District of Tennessee; Edward T. Sanford, Judge.

Suit by the Manufacturers' Finance Company against Nathaniel P. Le Sueur and another, surviving members of a liquidating committee, and another. From a decree in favor of plaintiff, defendants appeal. Modified and remanded, with directions.

James S. Pilcher, of Nashville, Tenn., for appellants.

John J. Vertrees, of Nashville, Tenn. (Frank, Emory & Beeuwkes, of Baltimore, Md., and William O. Vertrees, of Nashville, Tenn., on the brief), for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. This is an appeal from a decree in favor of the appellee, as plaintiff, under a bill in equity for an accounting and recovery with respect to the financial dealings hereinafter narrated.

Plaintiff is a Delaware corporation, having its principal place of business at Baltimore, Md., with power, among others, to acquire and deal in accounts receivable and choses in action and to loan money. The Montgomery-Moore Manufacturing Company is a Tennessee corporation, lately manufacturing and selling harness and other like goods

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

at Nashville, Tenn. On July 26, 1912, the Finance Company and the Manufacturing Company contracted in writing in terms for the purchase by the Finance Company from the Manufacturing Company of accounts receivable, notes, contracts, and choses in action, belonging to the Manufacturing Company and acceptable to the Finance Company (all characterized as "accounts"), at specified discounts from the face value of the accounts, dependent upon the time within which the accounts should be paid, 80 per cent. (less an agreed percentage charge) being paid in advance, the Manufacturing Company agreeing upon demand to buy back from the Finance Company all accounts which should be defaulted and to pay the Finance Company the face value thereof—all subject to adjustments provided for by the contract. The Manufacturing Company and its president were authorized, as agents of the Finance Company, to collect the accounts at the expense of and at the office of the Manufacturing Company, the parties so authorized agreeing to transmit to the Finance Company, at its office in Baltimore, on the day of their receipt all checks, drafts, etc., received in payment of or on account of the assigned accounts. Pursuant to this contract, the Manufacturing Company from time to time transmitted to the Finance Company, at Baltimore, written lists and assignments of large numbers of the Manufacturing Company's accounts, aggregating many thousands of dollars[1] and acknowledging receipt from the Finance Company of the same for collection solely as agents for the latter, and agreeing to buy at face value all of such accounts which should become in default.

On June 25, 1914, while the agreement in question was still in force and operation, the Manufacturing Company became financially involved, and by action of its stockholders a committee was appointed to take charge of and liquidate its business and affairs, and on the 30th day of July following an agreement was made between the liquidating committee (which had already made a considerable number of collections and remittances), the Manufacturing Company, and the Finance Company by which the committee and the Manufacturing Company agreed to forward by mail to the Finance Company, on the day of receipt, all original remittances and collections on claims and accounts theretofore assigned by the Manufacturing Company to the Finance Company, with authority to the latter to apply the same in accordance with the terms of the original contract of July 26, 1912, but without prejudice to the rights of the Manufacturing Company and its committee "with respect to the matter of usury, or any other matters under" that contract, and the transactions had thereunder—the Finance Company agreeing to execute and deliver a bond in the sum of $15,000 to secure the Manufacturing Company and its assigns for all moneys which might be payable to it from the Finance Company on account of remittances and collections forwarded to it, after July 1, 1914, in case

---

[1] There were 121 of these lists and assignments, representing nearly $300,000 of transactions. Twenty-seven of these transactions were fully closed, but the entire 121 transactions were the subject of the accounting hereinafter mentioned; defendants being credited with overpayments on the 27 closed transactions.

the original contract should be held usurious. The committee thereupon continued to make collections, and, until November 14, 1914, remitted as provided in the agreement of July 30, 1914, the committee's remittances after July 1, 1914, aggregating $16,349.14. After November 14, 1914, the committee continued to make collections, but made no further remittances, on account of its claim that the contract was usurious and void, as well as a defense that plaintiff was "doing business" in Tennessee. Thereupon, on May 22, 1915, the Finance Company filed its bill of complaint, asking decree against the liquidating committee for the delivering up of all the accounts not collected, and in default thereof for the "amount" thereof, as well as for appropriate relief with respect to the moneys collected and retained by the liquidating committee.

The defendants, by answer, asserted that the contract was in reality but an agreement for the loan of money (upon the security of the assigned accounts) at usurious rates of interest, and that the contract and proceedings had thereunder were therefore void; that the transactions amounted to a doing of business by plaintiff in Tennessee without filing a copy of its charter in the office of the secretary of state; that for the reasons stated plaintiff had no standing in court, and that defendants were so entitled to a decree against plaintiff requiring the latter to return to the liquidating committee all of the moneys so paid to plaintiff since July 1, 1914, as well as a certain note held by plaintiff. Upon hearing had upon pleadings and proofs, the District Court, on October 3, 1918, filed its opinion holding that the contract of July 26, 1912, was entered into at Baltimore and was a Maryland contract, and so to be construed in accordance with the laws of that state; that the subsequent assignments to the Finance Company of the merchandise accounts of the Manufacturing Company are likewise governed by the laws of Maryland; that the agreement of July 26, 1912, was a contract for loans by the Finance Company to the Manufacturing Company at usurious rates of interest, to be secured by assignments of the accounts; that under the laws of Maryland the agreement in question was absolutely void, and that plaintiff was thus entitled to no relief, but that the liquidating committee was entitled to recover from the Finance Company to the extent that the remittances already made constituted the payment of usurious interest, subject to certain limitations stated in the opinion; that the execution of the contracts in Maryland, although intended to be partly performed in Tennessee, did not of itself constitute a doing business in Tennessee. The court found it unnecessary to determine whether the collection through the Manufacturing Company of assigned accounts was interstate commerce, being of opinion that such accounts were collected, whether by the Manufacturing Company or the liquidating committee, as agents of the Finance Company, and that the defendants were therefore estopped, when sued by their principal, from relying upon the latter's non-compliance with the foreign corporations statutes as a defense to such action. A decree was accordingly entered adjudging the plaintiff not entitled to any recovery under its bill, but entitling the liquidating committee to recover the usurious interest as before stated. Reference was made to a special master to take and state an account.

After the expiration of the term at which this decree was entered, but before action was had on the special master's report or final decree entered in reference to the counterclaim, the trial judge requested and heard arguments of counsel on the question whether in view of a decision by the Court of Appeals of Maryland, subsequent to the decree of October 29, 1918, error had not been made in holding the loans and assignments of accounts in security therefor entirely null and void, and whether on that ground the former decree should not be vacated and corrected on the court's own motion. The court thereupon held that under the recent construction given by the Maryland court the loans in question were not void, but that the only effect of usury was to void the excessive interest over the legal rate; that its former decree of October 29, 1918, was not a final decree, but was merely interlocutory, still remaining under the control of the court and subject to its revision; and that the decree theretofore entered was erroneous both in entirely denying plaintiff's claim and in awarding counterclaim to defendants. A decree was accordingly entered setting aside the former decree, and ordering reference to a special master to state an account as to the sums due plaintiff. The master found plaintiff entitled to recover $19,856.67, plus interest thereon at 6 per cent. per annum amounting to $11,737.36, and rejecting defendant's contention that plaintiff should be charged with the expenses incurred in collecting the assigned accounts; also charging defendants with the premium of $150 on the bond given by plaintiff under the contract of July 30, 1914. Final decree was entered for the amount found by the master.

[1] 1. Whether or not, previous to the adoption of equity rule No. 30 (201 Fed. v, 118 C. C. A. v), the decree would have been final, in the sense that the court had no power to set it aside after the term at which it was entered, we think that under the rule referred to the trial court had jurisdiction to reconsider the case and set aside the decree, if deemed erroneous. General equity rule No. 30 *requires* the setting up by answer of any counterclaim *arising out of the transaction* which is the subject-matter of the suit. This requirement was evidently designed to save the courts the necessity of two trials over what to all intents and purposes should be a single suit, and this court has held that a defendant disregarding this requirement thereby waives his counterclaim. Caflisch v. Humble, 251 Fed. 1, 5, 163 C. C. A. 251 (see in this connection Howard v. Leete, 257 Fed. 918, 925, 169 C. C. A. 68; Lyons v. Empire Fuel Co. [C. C. A.] 262 Fed. 465, 467, 468; Knupp v. Bell [C. C. A. 4] 243 Fed. 157, 161, 156 C. C. A. 23). We may add that Buffalo Specialty Co. v. Van Cleef, 227 Fed. 391, 142 C. C. A. 87, does not seem in point; and that little help is derived from Barrel Co. v. Barrel Co. (C. C. A.) 268 Fed. 536. It is to be noted that with respect to counterclaims which do not grow out of the transaction forming the subject-matter of the bill the right to present such counterclaim is merely permissive, and failure to assert it is not followed by the result which attaches in the case of counterclaims arising out of the transaction which is the subject-matter of the suit. But where the counterclaim is made the bill and counterclaim do not constitute two suits (as under the old practice of original bill and cross-

bill), but "final judgment" is to be pronounced "in the same suit" both on the original and cross claims.

Unless plaintiff's suit and the counterclaim were so bound together as to constitute a single suit the trial court would not be able to "pronounce a final judgment in the same suit," both on the original and cross claim. Plainly, the counterclaim in this case arose out of the very transaction which was the subject of the bill. In view of this situation, not only would it seem a harsh rule to require a plaintiff to appeal from so much of the decree as was against it, while another branch of the "same suit" was purposely left open, but such an appeal would seem to violate the rule which forbids appealing in fragments. The trial judge did not regard his decree as final, for he did not dismiss the bill. He plainly regarded the suit as a single one, as the law peremptorily declares it to be. We think the decree of October 29, 1918, should therefore be regarded as still under the court's control.

[2] 2. We have no difficulty in agreeing with the conclusion of the District Judge, that the contract of July 26, 1912, did not provide for the actual purchase of accounts, but provided only for loans by the Finance Company to the Manufacturing Company at usurious rates of interest, averaging at least 2 per cent. a month and secured by assignment of the accounts. The Finance Company was never to pay 100 per cent. of the face value of the accounts, but was to discount the same at the rate of 1 per cent. on accounts paid within 15 days, 2 per cent. on accounts paid within 30 days, and one-half of 1 per cent. additional on accounts paid after the first month from date of purchase, for each succeeding half month or fractional part thereof, so long as the account remained unpaid. It paid at the time of receiving the assignments but 80 per cent. of the face value of the accounts, less an agreed charge of 3 per cent., afterwards increased to 5 per cent. From the remaining 20 per cent. were to be deducted the discounts above named, together with the readjustment charge referred to. On the Manufacturing Company's repurchase of accounts when "defaulted," it was required to pay the full face value. The conclusion that the purported purchase plan was merely a device intended to cover up the usurious character of loans is well supported by authorities. Home Bond Co. v. McChesney, 239 U. S. 568, 36 Sup. Ct. 170, 60 L. Ed. 444; In re Grand Union Co. (C. C. A. 2) 219 Fed. 353, 359, 135 C. C. A. 237 et seq.; In re National Discount Co. (C. C. A. 6) 272 Fed. 570, 573, 574; Tennessee Finance Co. v. Thompson (C. C. A. 6) 278 Fed. 597, 600.

[3-5] 3. We think it clear that the loan contract was a Maryland contract, and is to be governed and construed according to the laws of that state. The original contract of July 26, 1912, states that it is "entered into at Baltimore, Md." In the body of the contract it is declared "that the provisions of this agreement shall be construed and interpreted in accordance with the laws and decisions of the state of Maryland." Baltimore was the Finance Company's principal place of business, where it carried on transactions of the nature of those involved here. It was entirely competent for the parties to the contract effectually to agree that the laws of Maryland should govern its construction. Penn Co. v. Mechanics' Co. (C. C. A. 6) 72 Fed. 413, 418,

19 C. C. A. 286, 38 L. R. A. 33, 70; Russell v. Grigsby (C. C. A. 6) 168 Fed. 577, 579, 580, 94 C. C. A. 61. It is thus not important that the contract was prepared at Nashville, and there signed by the Manufacturing Company and forwarded to the Finance Company at Baltimore, where it was executed by that company and a copy sent therefrom to the Manufacturing Company.

Defendants contend, however, that the actual loan transactions were Tennessee contracts, and not controlled by the original contract of July 26, 1912. The prominent features of the argument are these: The Finance Company agreed to buy only the accounts belonging to the Manufacturing Company "which are acceptable to" the Finance Company, and there was thus no obligation as to time and volume of purchases, the Finance Company being at liberty to reject any accounts offered; that there was thus no consideration for the contract of July 26, 1912, the subsequent assignments alone being upon consideration; that the assignments and certificates forwarded by the Manufacturing Company from Nashville to Baltimore contained the words "dated at Nashville, Tenn.," and that these assignments constituted the only legal contract between the parties. This argument we think fails to give due effect to the actual course of dealings between the parties, as well as to the express provision of the original contract, that the Manufacturing Company should "by proper instrument in writing assign and set over to the Finance Company such accounts purchased by it as aforesaid," as well as the fact that in the written assignments "the agreement existing between" the parties (which can only mean the original contract of July 26, 1912) is referred to in connection with the collection of the accounts by the Manufacturing Company as agent for the Finance Company, as well as with respect to the Manufacturing Company's agreement to repurchase accounts that should become in default, thus tying together the original agreement and the specific assignments, and in effect carrying into the latter the agreement as to the place of the contract contained in the original agreement. It also appears that in carrying out the agreement the Manufacturing Company first transmitted to the Finance Company lists of accounts which it proposed to assign, which lists were by the Finance Company copied into its printed form of certificate and mailed (accompanied by check) to the Manufacturing Company for execution by the latter and return to the Finance Company, the latter, upon receipt of the formal certificate, signing the acceptance, an unsigned notation of which was already upon the certificate when sent to the Manufacturing Company for execution by it.

In the opinion of a majority of this court, the District Court rightly held that the assignments constituted a continuous and connected series of transactions done in performance of the original Maryland contract, and thus governed by the laws of that state, and that the execution of the specific assignments was completed in Maryland by the formal acceptance at Baltimore by the Finance Company, whether such acceptance be regarded as made when the assignments were forwarded to the Manufacturing Company for its signature or at the time the signature to the acceptance was formally attached.

[7] 4. Under the statutes of Maryland, as construed by the highest court of that state, and subject to an exception to be later noticed, usurious contracts of loan are made invalid only to the extent of the interest in excess of 6 per cent. per annum. Brown v. Real Estate Investment Co., 134 Md. 493, 496, 107 Atl. 196. The exception referred to is that loans by corporations, on the security of chattels, at a greater rate of interest than 6 per cent., are void, but that the statute applies only to loans on that class of security. Commercial Ass'n v. Mackenzie, 85 Md. 132, 142, 36 Atl. 754, 757, where it was said:

"After full consideration we think that the act does not apply to any securities except those which bind chattels." Chipman v. Farmers' & Merchants' Nat. Bank, 121 Md. 343, 358, 88 Atl. 151.

—and that a loan upon the security of assigned accounts is not a loan on the security of chattels. Brown v. Investment Co., supra., 134 Md. at pages 494 and 496, 107 Atl. 196. We think these decisions must be accepted as a settled construction of the state statute by the highest court of the state, and so binding upon the federal courts. No. Pacific R. Co. v. Meese, 239 U. S. 614, 36 Sup. Ct. 223, 60 L. Ed. 467; Nickel v. Cole, 256 U. S. 222, 41 Sup. Ct. 467, 65 L. Ed. 900; Construction Co. v. Burns, 284 Fed. 358, decided by this court November 7, 1922. It follows that plaintiff was entitled to enforce the loan contracts in question to the extent of the principal thereof and interest at 6 per cent. per annum, unless precluded from suing in the courts of Tennessee, through failure to comply with the statute of that state (Thompson's Shannon's Code, §§ 2546, 2547; Harris v. Water & Light Co., 108 Tenn. 245, 67 S. W. 811), forbidding foreign corporations doing business therein without first complying with its provisions.[2]

[8-10] 5. We are strongly inclined to the opinion that plaintiff was not "doing business" in Tennessee. (It may be said in passing that if, as we are disposed to think, the business in question done by the Finance Company was interstate in character, the Tennessee statute relative to doing business in the state would have no application.) Plainly, the making of the original contract, and the subsequent making from time to time of loans under the original contract, did not constitute "doing business" in that state; and it would seem that the fact that the assignor (for purposes of security), who resided in Tennessee, collected its own accounts at its own expense, and transmitted through its own office (the Finance Company having no office in Tennessee) and

---

[2] Defendants assign, as further reasons why plaintiff should not recover, the fact that the rate of usurious interest charged was flagrantly large and such as to be destructive of ordinary business; that it was secret as against other creditors; that it caused carelessness and recklessness on the part of the executive officers of the Manufacturing Company in creating bad debts, and created in those officers a disposition to laxness, etc. These considerations are properly addressed to legislative and not to judicial consideration. The effect of usury is wholly a matter of the public policy of a state, and the courts can not create a different policy. In Nat. Discount Co. v. Evans, supra, we had occasion to refer to the fact that by the statute of Tennessee no record of assignments such as are here in question was requisite to their validity against either the assignor or its creditors, and that the situation in that respect was not changed by the intervention of bankruptcy. The same is of course true as to the intervention of liquidation proceedings.

presumably in its own interest,[3] the proceeds to the Finance Company at Baltimore, did not constitute "doing business" by the Finance Company. Mitchell Wagon Co. v. Poole (C. C. A. 6) 235 Fed. 817, 824, 825, 149 C. C. A. 129; Gen. Investment Co. v. L. S. & M. S. Ry. Co. (C. C. A. 6) 250 Fed. 160, 165, 162 C. C. A. 296; Mich. Lubricator Co. v. Ontario Cartridge Co. (C. C. A. 6) 275 Fed. 902; Cooper Rubber Co. v. Johnson, 133 Tenn. 562, 182 S. W. 593, L. R. A. 1917A, 282. But, however this may be, in the opinion of the majority of this court, both the Manufacturing Company and its liquidating committee are estopped from invoking the inhibition of the Finance Company to do business in the state, as against the recovery of moneys collected by either the Manufacturing Company or its liquidating committee under the conditions existing here.

By the contract of July 26, 1912, the Manufacturing Company and its president (Mr. Moore), as already said, were given the "right and privilege to make collections at the expense of and at the office of" the Manufacturing Company of all accounts assigned to the Finance Company. The contract expressly declared that such collections should be made by the parties named as agents of the Finance Company, and it was made their duty to transmit and deliver to the latter company, at its office in Baltimore, the proceeds of such collections. On elementary principles, the Manufacturing Company would be estopped to urge the Tennessee statute in question as a defense to recovery on account of the collections made. Insurance Co. v. Kennedy, 96 Tenn. 711, 716, 36 S. W. 709; Packet Co. v. Agnew, 132 Tenn. 265, 271, 177 S. W. 949, L. R. A. 1916A, 640. We think the liquidating committee equally estopped. It was essentially a trustee for the benefit of creditors of the Manufacturing Company, analogous to the position of a common-law assignee for such benefit or a receiver.

In Nat. Discount Co. v. Evans, supra, 272 Fed. 574, we held that the fact that the Discount Company had not complied with the Tennessee statute did not forbid the recovery of sums collected on the assigned accounts by either the bankrupt or its receiver.[4] We see no controlling distinction between that case and this in that respect, even had not the committee's agreement of July 30, 1914, been made. Indeed, by that agreement the committee expressly recognized the provisions of the agreement of 1912 relating to collections upon the assigned accounts and remittances thereof to the Finance Company. Both the committee and the Manufacturing Company agreed to remit to the Finance Company on the day of receipt all collections so made, and that the Finance Company should use and apply the same in accordance with the terms of the 1912 contract. The fact that such action on the part of the Manufacturing Company and its liquidating committee was declared to be without prejudice to the assertion by the

---

[3] The Manufacturing Company was not bound to make such collections. It was merely given the "right and privilege" to do so. Either party was entitled to terminate the arrangement at will.

[4] In the National Discount Co. Case, as in this, the contract took the form of a purchase of accounts. In that case, as in this, the plaintiff was held a creditor.

latter of alleged invalidity of the contract does not, in our opinion, affect 'the result; nor does the fact that the collections here sued for were made by the committee after it had decided to deny the Finance Company's right to recover the same.

Defendant's contention that the 1912 contract was usurious and void did not, we think, create an adversary relation in the committee as respects the mere collection of accounts. The arrangement with the committee was manifestly intended to preserve the status quo ante until the rights of the parties should ultimately be passed upon. The liquidating committee still occupied a fiduciary relation toward the plaintiff. Construing the contract in all its parts, the Finance Company did not, in our opinion, agree to return the collections made and remitted by the committee unless or until its contract should be found bad. If the committee was not the agent of the Finance Company in making the collections, it was all the time the representative of the Manufacturing Company, and neither the latter nor its liquidating committee had any right to collect accounts except by virtue of such original agency by the Manufacturing Company, or the permission given to the committee, as the Manufacturing Company's representative, to stand in that company's shoes to the extent stated.

6. It follows from the conclusion we have announced that plaintiff is entitled to recover the principal of the loans made by plaintiff to the Manufacturing Company, with interest thereon at 6 per cent. per annum, and that defendants are not entitled to recover under the counterclaim the moneys paid to plaintiff. The final decree found that the effect of the usurious loans is to "entitle plaintiff to recover on each loan transaction evidenced by each separate certificate of indebtedness merely the amount advanced as a loan, with interest at the rate of 6 per cent. per annum, after crediting all payments made thereon," etc. It is admitted that upon that basis the evidence sustains the final decree as to the amount of principal and interest due plaintiff. The criticism is made that the 121 loans should have been treated as a continuing running account, and not as separate loans (perhaps on a "partial payment" theory), on account of the fact that each of the 121 loans was in default when the assignment to the committee was made. We are not pointed to a condition of the record which, in our opinion, supports the conclusion contended for.

[11] 7. In our opinion, however, the liquidating committee should have been allowed the cost of the collections which it made, the amount of which, as shown by uncontested evidence, is $4,446.52. True, by the agreement of 1912, between the Finance Company and the Manufacturing Company, the latter was to make collections at its own sole expense, and in the agreement of July 30, 1914, between the liquidating committee and the Finance Company, the former agreed to forward remittances for accounts collected "in accordance with the terms of said contract of July 26, 1912," 'there being, however, otherwise no reference, direct or indirect, to the cost of collection. The Manufacturing Company, however, is insolvent; its general creditors cannot be paid in full; the decree in plaintiff's favor exhausts the entire fund in the committee's hands arising from the collection of the assigned accounts; and unless expense of the collections by the committee up-

on these accounts is paid out of the amounts collected, the result is that such expense must be paid by general creditors. Assuming that the committee had power to agree to pay the expenses out of general assets, provided there remained sufficient to pay general creditors in full, not only is it open to serious doubt whether the committee had power to make such agreement as against general creditors of an insolvent estate (especially in view of the terms of the stockholders' assignment to the committee), but in our opinion to impose such liability would be inequitable as against general creditors.

[12] 8. We also think the premium upon the bond given by the Finance Company in connection with the contract of July 30, 1914, should not be charged against defendants. The contract last referred to provides that if the loan contract is held to be usurious, and moneys are decreed to be paid by the Finance Company to the Manufacturing Company, the former shall pay the premium; but if the loan contract is held not to be usurious then the Manufacturing Company should pay the premium. It turns out that the contract is held usurious, but moneys are not decreed to be paid by the Finance Company to the Manufacturing Company. To say the least, the agreement as to payment of premium is ambiguous; perhaps, more properly, it fails to take the existing situation into account. Normally the party required to give a bond pays the premium therefor. We think the normal course should be followed.

[13] 9. We also think the full costs of the proceedings in the District Court should not be awarded to plaintiff, but that those costs should be divided, one half to plaintiff, the other half to defendants. It is true that plaintiff was ultimately the prevailing party, but it recovered upon a different theory than that on which its bill was filed, and the recovery was substantially less than permissible had the 1912 contract been found to be one of sale, and not of usurious loan. Naturally defendants have been obliged to contest plaintiff's construction of the nature of the contract, and plaintiff's recovery upon our review is substantially less than awarded below.

The decree of the District Court should be modified in respect of the three last items mentioned in this opinion. The formal order will be that the decree be reversed and the record remanded to the District Court, with directions to enter a new decree in accordance with this opinion. Appellants will recover their costs of this court.