### LUCKENBACH v. PEARCE.

(Circuit Court of Appeals, Fifth Circuit. February 17, 1914.)

#### No. 2563.

MARITIME LIENS (§ 9*)—SERVICE OF STEVEDORE.

A stevedore, rendering services in loading or discharging a vessel in other than her home port, has a maritime lien therefor, and cannot be held to have abandoned the right to such lien because the person with whom he contracts may represent a charterer, or for other reason be without actual authority to bind the owner, of which fact the stevedore has no knowledge.

[Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 13; Dec. Dig. § 9.*]

Appeal from the District Court of the United States for the Southern District of Texas; Waller T. Burns, Judge.

Suit in admiralty by J. E. Pearce against the steamship Jacob Luckenbach; Edgar F. Luckenbach, claimant. Decree for libelant, and claimant appeals. Affirmed.

Jas. B. Stubbs, of Galveston, Tex., and Peter S. Carter, of New York City, for appellant.

John C. Walker and Marsene Johnson, both of Galveston, Tex., for appellee.

Before PARDEE and SHELBY, Circuit Judges, and GRUBB, District Judge.

PARDEE, Circuit Judge.    This is a libel in rem to recover for stevedore's services in unloading the steamship Jacob Luckenbach in the port of Galveston in June, 1911.   The Jacob Luckenbach was claimed for owner Edgar F. Luckenbach of New York, and was under charter to George R. Dilkes & Co., of Philadelphia, who sublet the same to Jacob F. Lent, manager and agent of the Baltimore & Texas Steamship Company of Baltimore, and this last-named company had an agent, H. N. Bernheimer, at Galveston.   The charter parties provided that the expense of unloading the vessel should be paid by the charterers.

The case shows that under similar charters to the same parties the steamships Jacob Luckenbach and D. N. Luckenbach had been coming to the port of Galveston for some time, and at the request of the agent of the Baltimore & Texas Steamship Company had been unloaded by the libelant, and that on June 9, 1911, when the D. N. Luckenbach arrived at Galveston the situation was that for previous services rendered by the libelant in unloading the Luckenbach vessels the libelant had not been paid and there was due him $2,500.

The libelant testifies:

"When the D. N. Luckenbach came into the dock on or about June 9, 1911, I went aboard the steamer and stated to Capt. Coonan that the affairs of the Baltimore & Texas Steamship Company here were in very doubtful condition, and that their credit was bad, and at that time they owed me quite a lot of money, which I expected them to pay that day—the day I was talking to him—but their credit was so bad I did not care to continue to handle the business on their account, unless it was guaranteed in some way by the owners of the ships, so I could look to the vessels for the stevedore's charges, and Capt. Coonan said that he would take the matter up right away with his owners in New York, but he felt that his people would make it all right, and along during the day the account of the Baltimore & Texas Steamship Company was paid by them, and I went ahead and discharged the boat, expecting to hear from the owners of the boat before she got away. I knew she would be here 8 or 10 days, and after the discharge was finished at Galveston, she shifted to Texas City and discharged coal, and Capt. Coonan came over to Galveston and telephoned me and said: 'Come down and meet me; I have good news for you'—and I met him at the Model Market, and he said: 'The reason I asked you to come down was that I just received a letter from my people directing me to tell you not to libel our boat; that they would see that all stevedores' bills were paid.' Q. Did that relate to both vessels? A. That related at that time to his own vessel, because the other had not come in—she followed 15 or 20 days after—and on the strength of that I permitted the boat to get out of town without making any further effort to libel, or take the matter up any further, because I knew the credit was good; the general reputation of Luckenbachs was good. Q. Did you intend to libel the boat at that time for the services, if it had not been guaranteed? A. If I had not received these assurances from Capt. Coonan that they would be paid. Q. That assurance from Capt. Coonan, the master of the D. N. Luckenbach? A. Yes, sir. Q. When did the other vessel come? A. She followed something

like 15 days afterwards. Q. Did you discharge her, too? A. I discharged her on the strength of the understanding I had with Capt: Coonan, because his conversation referred to all other boats and not the D. N. Luckenbach in particular—their boats he referred to. Q. Did Capt. Coonan exhibit any letter to you? A. No, sir; he did not. He said that he had the letter. Q. Told you that they had given him authority to do so? A. Yes, sir. * * * Q. Do you know of any charter party to any other persons by the Luckenbachs? A. I do not know, sir. Q. You never knew of it? A. No, sir. Q. You are friendly with the agent of the vessels, the master—were you friendly, or not, with the agent of the Baltimore & Texas Steamship Company—did any one who was presumed to have possession or knowledge of its charter party ever tell you anything about one? A. My recollection of it is that no one here seemed to know how the boats were operating in here, and nobody at this end of the line seemed to have any knowledge of what arrangements were made here.

"Court: Did you not work with the Baltimore & Texas Steamship Company to unload the vessels at previous dates? A. All previous trips. Q. As between the same parties? A. Yes, sir. Q. When the credit of that concern grew indifferent, or became bad, as I understand, you were not willing to enter into a contract with them any longer, unless the payment for the loading and unloading was guaranteed by the ship? A. Yes, sir; I would not discharge the vessels on these two occasions had I not received assurances from Capt. Coonan that the bills were to be paid. It developed that George R. Dilkes & Co. were connected with the proposition, but up to the taking of the depositions I never heard of them having any connection with the vessels at all. * * * Q. Passing from that now, how long after that was it that you unloaded the Jacob Luckenbach? A. As I stated before, it was something like 12 or 15 days; I have not the exact number of days. Q. In the meantime had you presented your bill to any one? A. Yes, sir; that had been presented to Mr. Bernheim in the usual manner. Q. To the Baltimore & Texas Steamship Company's agent? A. Yes, sir. Q. What did he do with it? A. I do not know. He did not pay me. Q. When was the first time you presented it to the Luckenbach line, the owners of the vessel? A. The company failed just about that time. Q. What company? A. The Baltimore & Texas Steamship Company, or, at least, suspended their sailings just at that time. The Jacob Luckenbach was here, and I immediately turned the affairs over to my attorneys. Q. When was she here? A. I say she was here from 12 to 15 days after I handled the D. N. Luckenbach. Q. What time, about? A. That would be about the 25th or 30th of June, I judge; I may be a day or two off. I can tell what date I rendered the bill, if that would be any assistance to you. The bill was made on June 29th. At that time the boat was discharged, and the probabilities are I handled her about the 25th of June. Q. At that time the boat was entirely discharged? A. Yes, sir; at the time the bill was made. Q. To whom was it made? A. To Bernheim, representative of the Baltimore & Texas Steamship Company. Q. Did you receive any further assurances from the Jacob Luckenbach? A. I had received nothing because I had not had sufficient time to hear from my first bill. The first bill was made on June 22d, and only a week before the two bills—the second bill on June 29th. Q. When was the first time you communicated with the Luckenbach people? A. I do not remember the exact date of that telegram, Mr. Stubbs. Q. Is this a copy of the telegram? A. My copy has been misplaced. Q. Is that a copy? A. This is the New York original, I guess. Q. The New York original? A. Yes, sir; that is correct. This is the original itself. This is the receiving operator's telegram of the message.

"Mr. Stubbs (Counsel for Respondent): I will read the telegram. It is dated Galveston, Texas. 'Received 16—paid ———. July 12, E. F. Luckenbach, Bridge Street, New York. Rumored here that Lent has suspended further sailings. Can you advise if true. Reason for inquiry he owes me for stevedoring last two steamers, confidential. J. E. Pearce.'

"Q. What two steamers were these? A. The two in question. Q. Who was Lent, referred to? A. The general manager of the Baltimore & Texas Steamship Company. Q. Did you receive a reply? A. Yes, sir. Q. Have

you the reply? A. It was filed in the papers, and I do not know where it is now. I know what the reply is. Q. Look at that and state whether or not that is the correct reply. [Shows witness carbon copy.] A. Yes, sir; this is correct.

"Mr. Stubbs: I offer this in connection with same: 'Mr. J. E. Pearce, July 12, 1911. Understand Lent has sent out notices that shipments have been suspended. Take matter up with him direct at Pittsburg. E. F. Luckenbach.'

"Q. Did you take the matter up with Mr. Lent to be adjusted? A. No, sir; I took it up with my attorneys, when I knew he had suspended. Q. Did you communicate further with Luckenbach, or any other of the owners or managers? A. No, sir; Judge Walker and Judge Johnson have handled the case since that time.

"Re-examined (by Judge Walker): Q. Did you understand Capt. Coonan, that one of his undertakings was to guarantee to see you had payment for your services, and that it was to extend to the other vessels?

"Counsel for Defendant: Ask what the understanding was.

"Court: He stated what the agreement was.

"A. I answered that, that all he said to me was that he received a letter from his owners with further reference to the matter of stevedoring, and that they had told him to tell me not to libel their vessel; that they would see that the stevedoring bills was paid, not only on one vessel, but I construed it to continue on bills for handling their steamers. Q. Did you rely upon that promise? A. I relied upon it to the extent of permitting him to go to sea without any further effort to libel the vessel and to handle the following steamer. Q. Would you have done the work on the Jacob Luckenbach if it had not been for this guarantee? A. No, sir.

"Counsel for Respondent: We object to that.

"Q. Would you have handled the second at all if you had not had that assurance? A. No, sir. Q. And on that account that you did handle the D. N. Luckenbach? A. On that account I handled both of the Luckenbachs—the D. N. and Jacob Luckenbach."

The evidence by the libelant is practically uncontradicted, though there is much evidence in the transcript tending to show that Capt. Coonan had no authority to represent the owners as to discharging the Jacob Luckenbach, and that Capt. Coonan did not tell the libelant exactly what the libelant says he did, and did not tell the libelant anything showing, or tending to show, that he was representing the owners as to discharging other vesels than the D. N. Luckenbach of which he was master, so that, as to whom the libelant gave credit the evidence is that on June 9, 1911, the libelant who had theretofore been discharging the Luckenbach vessels under an agreement with the agent of charterers and possibly on the sole credit of the charterers, though thinking he had a lien therefor on the vessels discharged, decided that on account of failure of the charterers to pay and their bad credit he would no longer discharge the Luckenbach vessels unless upon a guaranty from the owners and on the credit of the vessel discharged; and thinking from the notice to Capt. Coonan and Capt. Coonan's representations as to the attitude and wishes of the owners that they would be responsible, he discharged the Jacob Luckenbach upon the credit of the vessel.

In Dennett v. The Main, 51 Fed. 954, 2 C. C. A. 569, this court held that a stevedore rendering services in loading and unloading cargo in other than the home port has a maritime lien therefor; and we followed this in The Norwegian Steamship Co. v. Washington, 57 Fed. 224, 6 C. C. A. 313, a case very similar in circumstances and issues to the

case in hand; and we quote from the opinion of the court in the latter case as applicable here:

"The duties of consignees or agents of ships, or the agents of charterers or owners, are so similar and undistinguishable that without some positive knowledge of their relations, contracts, and agreements, it is impossible to determine to which class an agency may belong; and the fact that a merchant purchases supplies, or procures services to be rendered a vessel, raises no presumption that he therefore sustains relations with the owners that make him responsible, and relieve the vessel from a lien. In the great majority of instances, in ordinary practice, the materialman or stevedore contracts with, and takes his bill for payment to, the agent of the ship, whether he represents the owners or charterers, without the intervention of the master; but by so doing he does not abandon his right to look to the vessel in event of a nonpayment. It cannot be presumed or expected that he can be informed as to the exact provisions of the charter, or the responsibilities of the parties, in each particular case.

"Examining this case in the light of these general principles, we fail to find any affirmative proof that the libelant was informed of the character or conditions of the charters, or either of them, or the responsibilities of the vessel or charterers, or in any way gave the agent personal credit, to the exclusion of the vessel, or that the circumstances are shown to be such that he should be held to have done so. The final charter—the one under which he was loading at this time—specified distinctly that the vessel should pay for the stevedoring; and, had he known of this, it was in no way compulsory upon him to go back of that, and find to whom the term 'the vessel,' there used, referred to, whether owners or previous charterers; and, were he ignorant of the provisions of either charter, it cannot be presumed he knew of, or contemplated, any paymaster but the vessel. There is nothing that shows that he knew what relation Hoadly & Co., through whose instrumentality he was employed, held to the vessel, any more than that they were the agents of Andress & Mitchel, whom he says he supposed to be the charterers' or owners' agents, some one who looked out for the business."

We concur with the District Court in holding that for services rendered by the libelant in unloading the cargo of the Jacob Luckenbach he has a maritime lien on the vessel.

The decree appealed from is affirmed.