## ATLANTIC, GULF & PACIFIC S. S. CORPORATION v. UNITED STATES.

(District Court, D. Maryland. February 16, 1923.)

Shipping ⬅➡27—"Ship" held not to include stores on board.

Where the government sold ships for a stated price, and the stores therein were separately appraised and paid for, on retaking the ships under the contract for default in payment, it cannot claim that the ships include the stores then on board, but such stores are the property of the purchaser.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Ship.]

In Bankruptcy. In the Matter of the Atlantic, Gulf & Pacific Steamship Corporation, bankrupt. On claim of United States to proceeds of ship's stores. Claim disallowed.

Stuart S. Janney, George Weems Williams, and L. Vernon Miller, all of Baltimore, Md., for trustee.

F. R. Conway, of Washington, D. C., and Amos W. W. Woodcock, U. S. Atty., of Baltimore, Md., for the United States.

ROSE, Circuit Judge. The controversy in this case is between the United States, on the one side, and a trustee in bankruptcy, on the other, as to who has the better title to $5,363.36, the proceeds of consumable stores found on board the steamships Liberator and Cape Henry at the time of their arrest by the Marshal, in a possessory suit in which the United States was libelant, and which resulted in the possession of them being adjudged to it.

Originally the ships had been purchased by the bankrupt from the government on the installment plan so to speak; that is to say, a comparatively small part of the agreed purchase price had been paid down,

the balance to be paid at certain fixed intervals. The purchaser became largely in default, and the seller exercised its reserved right of repossessing its ships at or about the time at which the buyer was adjudged a bankrupt. The dispute as to whether the stores went with the ship or passed with the other property of the bankrupt to its trustee at once arose. It was impossible at the moment for the court to give adequate consideration to the legal question involved, and it was to the interest of all parties that there should be no unnecessary interference with the completeness of the Government's control over the ships. As it proposed to lay them up for an indefinite period, if not forever, the stores were, as such, of no use to it. It was interested only in what they would fetch when sold. It was accordingly agreed that the receiver and trustee in bankruptcy should take the stores, sell them, and keep the proceeds intact until the court could determine to whom they belonged.

The United States relies on such cases as the Dundee, 1 Haggard, Admiralty Reports, 109; Gale v. Laurie (which is the same case on prohibition) 5 B. C. C. 156; The Witch Queen, 3 Sawy. 201, 30 Fed. Cas. 396, No. 17,916; The Manila Prize Cases, 188 U. S. 254, 23 Sup. Ct. 415, 47 L. Ed. 463; the construction put upon the last-named opinion in the contemporaneously decided case of The Infanta Maria Teresa, 188 U. S. 283, 23 Sup. Ct. 412, 47 L. Ed. 477, and the Frolic (D. C.) 148 Fed. 921. In the Supreme Court cases, it was adjudged that "ship or vessel of war belonging to an enemy," as employed in section 4635, R. S., "covered armament, outfit and appurtenances, including provisions, money to pay the crew or for necessary expenditures, everything necessary to be used for the purpose of the vessel and as a vessel of war." In another of the decisions it was held a chronometer lawfully on board, convenient, if not necessary, for the use of the ship, went with the ship when the latter was forfeited for the breach of the Chinese Exclusion Law, although it did not belong to the owners of the ship and had been hired by them for its use. The Frolic, supra. The fishing appliances on board a Greenland whaler, and worth almost as much as the rest of the ship itself, were held a part of it, within the English limited liability statutes, in that they were answerable with the ship for the latter's torts. The Dundee, supra; Gale v. Laurie, supra. For distinguishable reasons a diving bell belonging to the owner of a ship and necessary for its use in its pearl-fishing voyage was held subject to the lien of the material and supply man for necessaries provided by them for that voyage. The Witch Queen, supra. There are reasons well stated by Judge Brown in The Frolic, supra, why in forfeiture and prize cases everything used by the offender, or the enemy, in the commission of his crime, or in his waging of war, should come within one common condemnation. Few are inclined to dissent from the view of Judge Hoffman, that property belonging to the owner of the ship and put by him upon her for purpose of the voyage is subject to the lien of the materialman for the necessaries supplied for that voyage. The Witch Queen, supra.

For insurance purposes in the British Marine Insurance Act rule 15, schedule 1, the word "ship" is now declared to cover all materials

and outfit, stores and provisions, officers and crew, and, in case of vessels engaged in special trade, the ordinary fittings aboard, and also, in the case of a steamship, the machinery, boilers, engines and stores. St. 6 Edward VII, c. 41. This is but a codification of what has long been held to be the law. 1 Parsons on Marine Insurance; 1 Arnould, Marine Insurance (8th Ed.) §§ 219, 220. In view of all this, it may be that the conveyance of a ship would carry with it consumable stores on board it, if nothing appeared to show that the parties purposed otherwise. It would usually be in practice the more convenient rule, as was pointed out by Lord Tenterden, then Chief Justice Abbott, in Gale v. Laurie, supra; whereas, "if it should be held that nothing is to be considered a part of the ship that is not necessary for her navigation or motion on the water, that will introduce many nice questions, and much discussion would most likely be created." It is, however, a noteworthy fact that, so far as I know, there is no reported case in which the question has arisen between buyer and seller of a ship, or between a common-law mortgagor and mortgagee. Parsons, Shipping and Admiralty, 78, declared that how much passes by the word "ship" or the phrase "ship and her appurtenances, or apparel, or furniture, or the like," cannot positively be determined by any definition. Usage would have much effect in deciding this question, and it is obvious that things may be a part of the ship at one time and place and under some circumstances, and not at others.

There is nothing in the policy of the law which forbids the parties to deal separately with the ship and its stores on board, and if, when they sell one, retain the other, if they are so minded. As is stated by Parsons, usage in particular lines of shipping has much to do with the question. The trustee in bankruptcy has offered testimony to show that, in the case of the purchase and sale of ships, it is usual to make separate bargains as to each, and that evidence is uncontradicted and convincing, in so far as it goes to show that the custom is almost universal specifically to include or exclude the stores in any contract for the purchase or sale of a ship. It has little tendency to prove what the understanding would be if a ship was sold with stores on board, and nothing was said about them.

In the instant case, it is not necessary to rely on any external definition of what is a ship or upon proof of usage. The parties in the contract upon which the government relies define the ship, for themselves, as something other and different from the stores aboard them. When the United States sold, the price was fixed for the ships, and then the stores were separately appraised and separately paid for. The ships cannot mean one thing when the government sold them, and another thing when the government takes them back because part of the purchase price remained unpaid.

It follows that the claim of the government for the proceeds of the stores must be dismissed, and it must be held that they are a part of the general assets of the bankrupt's estate, and as such pass to the trustee.