## In re ATLANTIC, G. & P. S. S. CO.

(District Court, D. Maryland. April 28, 1923.)

No. 3776.

1. **Bankruptcy** ⬤⟶349—**Debts owing to United States entitled to priority.**

Under Bankruptcy Act, § 64 (Comp. St. § 9648), and Rev. St. § 3466 (Comp. St. § 6372), debts owing by a bankrupt to the United States are entitled to priority.

2. **Sales** ⬤⟶479(11)—**Conditional seller, by retaking property, surrenders all claim to unpaid purchase price.**

In the absence of contract to the contrary, where a seller of property, to which he retains title as security, retakes the property, he surrenders all claim to the unpaid portion of the purchase price, including past-due installments.

3. **Shipping** ⬤⟶27—**Retaking of property by seller and retention of payments received held, under the contract, liquidation of damages for breach.**

The United States sold certain ships to bankrupt, receiving a payment thereon and retaining title to secure further payments to be made from a trust and sinking fund, to be created from the earnings of the vessels and with the right to retake the vessels for default, in which case "the seller may retain all amounts paid by the buyer hereunder and any balance remaining in said trust fund or sinking fund as liquidated damages, but without prejudice to any other claims the seller may have against the buyer hereunder." The government retook the ships, some of which it resold as its own, and also retained all payments received. *Held*, that damages for breach of the contract were thereby liquidated, and that the United States had no claim against the bankrupt estate for the difference between the unpaid portion of the contract price and the market value of the ships when retaken.

4. **Bankruptcy** ⬤⟶318(2)—**Claimant estopped by enforcing original contract to assert modification.**

The United States sold ships to bankrupt to be paid for in installments, retaining title and the right to retake for default. After defaults, the parties negotiated for a change in the contract under which bankrupt was to pay for its use of the vessels, but the modification was not effected and the government retook possession under the terms of the original contract. *Held*, that it had no claim against the estate for hire of the vessels, based on the tentative agreement, which was never consummated.

5. **Shipping** ⬤⟶149—**Seller, on retaking vessel from agreed purchaser, held entitled to pending freight in cargo not delivered, as against assignee of purchaser.**

Where the United States, in accordance with the terms of the contract, retook possession of vessels which were being operated by bankrupt under a contract of purchase, it is entitled to freight pending on cargoes which had not been delivered, as against one to whom bankrupt had assigned such freight.

6. **Shipping** ⬤⟶149—**Freights may be assigned independently of the ship.**

Freights may be assigned independently of the ship, and a transfer of the ship does not carry freights earned, though not collected, as against a prior assignee.

7. **Shipping** ⬤⟶149—**Assignee of freights from contract purchaser held entitled to freights earned before ships were retaken by seller.**

Where a contract by the United States for sale of ships provided that freights earned should be paid into a fund on which the purchaser was authorized to draw for certain expenses of operation, the remainder to be applied on the purchase price, a company which lent money to

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the purchaser, which was used in payment of such expenses, taking assignments of freights to be earned as security, *held* entitled under its assignments to freights earned before the government retook the vessels for defaults, whether such freights had been collected and paid over to the assignee, or had not been collected at the time of the retaking.

In Bankruptcy. In the matter of the Atlantic, Gulf & Pacific Steamship Company, bankrupt. Various claims to liens by the United States and others considered.

F. R. Conway, of Washington, D. C., and Amos W. W. Woodcock, U. S. Atty., of Baltimore, Md., for the United States.

John Henry Skeen, Sylvan Hayes Lauchheimer, and Malcolm H. Lauchheimer, all of Baltimore, Md., for Commercial Credit Co.

Hugh Obear, of Washington, D. C., for International Finance Corporation.

Stuart S. Janney, of Baltimore, Md., for trustee.

ROSE, Circuit Judge. The bankrupt, the Atlantic, Gulf & Pacific Steamship Corporation, is a Maryland corporation. It never had more than about $150,000 of paid-in capital, and yet it agreed to buy from the United States six fine ships and to pay $9,300,000 for them. All of them were delivered to it, and it operated them for more than 18 months, but $195,469 was the total it paid on account of them. When, in August, 1922, the government, in consequence of the bankrupt's manifold defaults, repossessed itself of them, the decline in the saleable value of the ships had been so great that they were worth in the market not more than one-fifth of the price the bankrupt had promised to pay for them. Small as were the initial payments on the ships, they used all and more than all of the bankrupt's capital. It began its shipping business without a dollar of cash. For more than a year and a half it nevertheless managed to keep these large ships sailing among the principal ports of this country on the Pacific as well as on the Atlantic seaboard. In doing so, it accumulated many debts for fuel, supplies, repairs, and other things. If it had owned the ships, many of these would constitute maritime liens upon them, but, as the United States now has possession of them, the stevedores, supply and repair men, and the other marine creditors were forced to proceed against it under the Suits in Admiralty Act. More than 50 libels were filed by them, but as a consequence of the principles laid down in United States v. Carver, 43 Sup. Ct. 181, 67 L. Ed. 214, almost all of these have already been dismissed, although without prejudice to the right of the libelants to file their claims in this proceeding as general creditors of the bankrupt.

Some cash the bankrupt had to have. It never had any standing with the ordinary banks. From them it could get nothing. Its only resource was to the so-called credit and finance companies, who lend upon collateral. From two of these, the Commercial Credit Company and the International Finance Corporation, hereinafter styled the Commercial and the International, respectively, it was a steady borrower. These concerns sought to secure themselves by exacting pledg-

es of the freights, so soon as the cargoes were put aboard the ships. At the time the government repossessed itself of the vessels, the bankrupt had on hand a few thousand dollars, said to have come from these assigned freights, and which are consequently claimed by either the Commercial or the International, who also say they are entitled to whatever sums have since come in, or which may be hereafter realized, from the like sources.

[1] The United States asserts a specific lien or charge upon all these, superior both to the rights of the trustee and to those of the lending companies, and it says that under section 3466, R. S. (Comp. St. § 6372), it is entitled to preferential payment out of any assets coming into the hands of the trustee in bankruptcy. These assets will be meager, and, if the government is a preferred creditor for any substantial sum, it will take them all.

In Sloan Shipyards v. U. S. Fleet Corporation, 258 U. S. 549–574, 42 Sup. Ct. 386, 66 L. Ed. 762, the Chief Justice, in a dissent in which he spoke for Justices Van Devanter and Clarke, as well as for himself, expressed the opinion that in bankruptcy the United States had no preference, except for taxes. Apparently this was not the view of the majority of the court. In the subsequent case of United States v. State of Oklahoma, 43 Sup. Ct. 295, 67 L. Ed. ——, decided February 19, 1923, the assumption throughout all the discussion is that in cases of bankruptcy, section 3466 makes the United States a preferred creditor. Section 64 of the present Bankruptcy Act (Comp. St. § 9648) has unquestionably postponed the government's claims for other things than taxes, to state taxes and to the cost and expense of preserving and administering the estate and to salaries and wages. Guaranty Co. v. Title Guarantee Co., 224 U. S. 152, 32 Sup. Ct. 457, 56 L. Ed. 706. But, after all such demands are satisfied, it directs:

"There shall next be paid, debts owing to any person who by the law of the state or the United States is entitled to priority."

That language might easily be held broad enough to continue section 3466, R. S., in force, except in the respects in which it has been expressly modified by the Bankruptcy Act. It at least goes very far to negative the suggestion that Congress intended radically to recast the previously existing law as to priorities. The right of the United States to the preferential allowance of its claims has in the last few years been upheld by the Circuit Courts of Appeal of the First, Second, and Seventh Circuits. Davis v. Pullen (C. C. A.) 277 Fed. 650; In re Tidewater Exchange (C. C. A.) 280 Fed. 648; In re E. J. Hibner Oil Co. (C. C. A.) 264 Fed. 667. A District Court of the United States would scarcely be justified in ruling to the contrary.

What does the bankrupt owe the government? At the hearing the United States made two alternative contentions: First, that it was entitled to prove for the difference between the unpaid balance of the price the bankrupt had agreed to pay for the ships, and their sale or market value at the time it repossessed itself of them; second, that, if that were not so, it was at least entitled to claim the difference between the reasonable hire of the ships for the time the bankrupt had them and the sum it had received from the bankrupt.

The unpaid balance of the principal of the purchase price is $9,118,620.27, to which should be added interest thereon to the time at which the government repossessed itself of the ships, making a total of $9,913,748.90. From this must be deducted the value of the ships when they were taken back. That has not been definitely proved, but it is apparent that it did not at the most amount to as much as $2,000,000; that is to say, if the government's first contention is sound, it has a provable claim for somewhere around $8,000,000. An unpaid seller, who has turned a chattel over to the buyer while retaining title in himself, has the undisputed right to allow the buyer to keep it and to sue him for the balance of the purchase price. No matter what form the parties may have given the original transaction, it is not unreasonable to hold that in substance it was a sale and a mortgage back, and that in consequence the seller should be allowed to have the chattel turned into money, to pocket its net proceeds, and to sue the buyer for whatever still remained unpaid of the contract price. Williston on Sales, 964.

Unless there is something to the contrary in the agreement itself, few will gainsay the seller's right to do so, when he makes it clear that he himself treats the buyer as still having a subsisting interest in that which was sold by seeking to subject that interest to some kind of a foreclosure, formal or otherwise. To invoke the aid of a court of equity is the surest, but not necessarily the only, way of removing all doubt as to what he is trying to do. In the instant case, nothing the government did suggests that it thought the bankrupt had any further concern with the ships. It took them as the owner. At the bar, it was said that it had sold some of them, and still held others; but no evidence on the subject was tendered. So far as appears, the trustee in bankruptcy was never even officially notified of the sales, much less consulted about them, and no court was asked to approve them. The government throughout assumed that what it did with them was of no concern to any one else.

[2, 3] An agreement may give the seller all these rights, as the one before the court does, but the great weight of authority is that when the seller exercises them, he has irrevocably surrendered all claim for the unpaid portion of the purchase price. Manson v. Dayton, 153 Fed. 258, 82 C. C. A. 588; Russell v. Martin, 232 Mass. 379, 122 N. E. 447; Ohle & Cole v. Standard Steel Sections, 179 App. Div. 637, 167 N. Y. Supp. 184; Eilers Music Store v. Oriental Co., 69 Wash. 618, 125 Pac. 1023. What has been said has been upon the assumption that the parties themselves had made no provision for ascertaining and satisfying the damage which the buyers' default might cause the seller, but in this case the contracts are not silent on this matter. After defining what shall constitute a default on the buyers' part, and after declaring the seller shall have the right at any time thereafter to withdraw the vessels from the buyer, it goes on to state:

"Whereupon all rights and claims against the seller, arising in favor of the buyer hereunder, shall cease and determine, and the seller may retain all amounts paid by the buyer hereunder, and any balance remaining in said trust fund or sinking fund, as liquidated damages."

Adding, it is true:

"But without prejudice to any other claims the seller may have against the buyer hereunder."

The trust and sinking funds referred to are provided for in the agreement by the terms of which the buyer was to deposit funds received from the operation of the vessels in a special account, and was monthly to set aside a certain sum to provide the means for meeting the next semiannual installment of the purchase price. The payments which the buyer should have made to the seller were considerable. In the two years immediately succeeding the delivery of the ships they should have aggregated, in addition to interest, 30 per cent. of the purchase price, or more than $2,700,000. When the agreement of sale was made, everybody thought that the price fixed was fair, and that it would remain so, within a reasonable margin of fluctuation. It then seemed that the payments which would be from time to time made by the buyer would be a fair measure of a reasonable compensation for the use of the ships. Until the government had received as much as 50 per cent. of the purchase price, it did not wish to tie its own hands. In case of default, it wanted to take the ships back and close its account in a summary fashion, without being compelled to send them to the auction block. After the buyer had paid one-half of the price, it was entitled to an assignment of the ships, and was bound to give the seller a preferred mortgage on them for the unpaid balance. A draft of such mortgage is attached to the agreements of sale, which contains most of the provisions for ascertaining the rights of the respective parties on default usually to be found in similar instruments. Nothing of the kind is in the agreement of sale itself. In view of the elaborate provisions for many contingencies contained in it, the omission of any statement as to how the government, if it retook the ships, was to sell them, or was otherwise to ascertain their value, was obviously not an oversight. Its reliance was clearly upon its right to appropriate the installments of purchase money to the satisfaction of any damage it had suffered.

The learned counsel for the United States calls attention to the clause that the appropriation as liquidated damages of the sums paid or deposited "shall be without prejudice to any other claims which the seller may have against the buyer hereunder." He argues that these words show the parties intended that the seller should appropriate what it had already received, and then go on to prove its claim for damages precisely as if nothing had come to it. Such a construction would be so unjust that it cannot be accepted, so long as there is any escape from it. Even if it were clear that that is what the parties meant, a court of equity might still refuse to enforce it. Manson v. Dayton, 153 Fed. 258, 82 C. C. A. 588. Obviously, however, that is not what they had in mind. If the payments are to be taken by the government as its own, and are to be treated as liquidated damages, they must liquidate something, and what is so liquidated is satisfied, and cannot be made the basis of any further demand. This construction does not render of non effect, the reservation of the government's "other claims against the buyer." There were possible damages to be pro-

vided against, other than that resulting from the use of the ships by the buyer; for example, it agreed to keep the ships clear of liens. The breach of this understanding might well have subjected the seller to great loss, had the proper construction of the act of 1910 (36 Stat. 838) been what some then supposed it to 'be. If so, it would be entitled to demand compensation therefor from the buyer, although it might have already appropriated all payments and deposits made by the latter in liquidation of the damage it had suffered by reason of the nonfulfillment of the contract of purchase.

[4] The second alternative contention of the government is that, if it may not recover damages for the breach of the agreement of sale, it is entitled to compensation for the use of the. ships by the bankrupt. It has offered some testimony as to what would have been a reasonable bare boat charter hire for them during the period the bankrupt used them. It argues that the parties 'by common consent had put an end to the original agreement of sale, and that, as the provision for liquidated damages fell with the rest, it is entitled to prove what its actual damages were. U. S. v. United Engineering & Construction Co., 234 U. S. 236, 34 Sup. Ct. 843, 58 L. Ed. 1294. It seeks to sustain this contention by pointing out that for three of the ships the bankrupt never paid a penny, and all that it paid on a fourth amounted to less than 1 per cent. of the purchase price. None of the deposits called for were ever so made as to be of any advantage to the government. The postponement of the stipulated payments was with the knowledge, and in a sense, perhaps, with the acquiescence, of the Shipping Board, the government's representative in the matter. For months, the bankrupt and the board were negotiating for such a recasting of the contracts of purchase as would greatly reduce the price to be paid. It was apparently undisputed that, if the substituted agreement was perfected, the bankrupt should pay charter hire up to the time of the actual payment. of the new and diminished price. The board was willing to accept the new terms. It may be safely assumed the only reason the bankrupt did not close upon them was its inability to raise the sum required. Nevertheless, throughout these negotiations, the board always insisted that the old agreement was in force, and would remain so until the new one was actually concluded, as·it never was. The last important communication from the board to the bankrupt before the United States seized the ships made this plain. When the government took them, it based its right to do so upon the provisions of the original agreements. It is not now in a position to say that by mutual consent these had either been modified or abrogated. All that had happened had been that the government, without surrendering any of its rights, had refrained from immediate enforcement of them, always reserving to itself the right to do so whenever it saw fit.

The analysis of the terms of the agreement might at first suggest another ground .upon which the government could base a large claim. At certain fixed periods, the bankrupt promised to make payments of principal and interest, and between such payments to make monthly deposits towards the next payment. Had it done so, the government, when it retook the ships, would have had a couple of millions, more

or less, in its hands, which it would have been entitled to treat as liquidated damages. None of these payments or deposits were ever made. From one standpoint, by the bankrupt's failure to make them, the government has been damaged approximately to the amount named; but is a demand for compensation for such failure, in any proper sense, one of the other claims specially reserved? The authorities are practically unanimous that, in such a contract as this, the taking back by the seller of the thing sold puts an end to that portion of the agreement which binds the other party to pay the purchase price and extinguishes any claim that the seller has against the buyer for any installments that have not been paid. Doubtless the parties may stipulate otherwise, and if they do, and their bargain is a reasonable one, the courts will enforce it. In view of the settled law, such an understanding will not be presumed, and must be proved, and that has not been done. On the contrary, the clear implication, from the terms of the agreements and the language in which they are couched, is that the parties purposed that until 50 per cent. of the purchase price was paid, the taking back of the ships should extinguish all obligations growing out of either the covenant of the buyer to pay the purchase money or the implied promise of the seller to return any installments of the price which it had received when its repossessing itself of the ships had extinguished the original consideration for them. It follows that the government had no claim against the bankrupt for any part of the purchase money of the ships or for hire of them.

The result after all may not be unfair. The bankrupt kept the government's ships insured for the latter's protection at a cost of about a half a million. All the vessels were kept both in operation and in repair without charge to the seller, and when they were taken back they were doubtless in far better condition than they would have been, had they remained at their docks. $195,469 was actually received by the government from the bankrupt, which had the use of the ships for an average period of about 21 months. The United States therefore got for them $93,000 a month, or something over 17 cents a dead weight ton. The evidence of the value of them for chartering purposes was conflicting, but I am inclined to think that, if they had been demised on the bare boat basis, with the charterers assuming all the expense of insuring and maintaining them in good condition, 17 cents would have been quite as much as the government would have been able to get for them.

The government may have left the ships with the bankrupt too long, but that was its affair. It could have taken them back a year earlier, if it wished. When it decided it wanted to do so, it could have instituted a proceeding in equity, in which it could have had the ships sold and obtained a decree against the bankrupt for the balance of the purchase money. It made up its mind to take them back in the quickest way, and not to waste any time for the purpose of increasing its claim against an estate in which there was no probability that there would be any assets of great value. The choice it made was doubtless wise.

[5] As already stated, at the time the United States took possession of the ships, the bankrupt had in its possession a few thousand dol-

lars, which the lending companies, or rather one of them, says belonged' to it, because it claims to have shown the money came from freights which had been assigned to it. There are other freights which have been collected since the seizure and the filing of the petition in bankruptcy. These, or most of them, the bankrupt had previously assigned to one or the other of the lending companies. Some of them had been completely earned before the vessels were seized; others had not been. The lending companies concede that the United States is entitled to be reimbursed out of the latter for such expenditures as it was necessary for it to make in earning them. There are still due and uncollected freight bills to the amount of a number of thousands of dollars. Some of these belong to one and some to the other of the classes above mentioned. There is very little room for difference of opinion as to the freights upon such portions of the cargoes of any of the ships as had not been completely delivered at the time the government repossessed itself of the ships. The agreements of sale under which it took possession of the vessels long antedated the assignments upon which the companies rely, and there is no room for question that under such circumstances, when the government took the ships, it became entitled to all freights not then completely earned. Merchants' Banking Co., Limited, v. Cargo of the Afton, 134 Fed. 727, 67 C. C. A. 618. The subject is there fully examined and many of the English cases, which lay down this rule unqualifiedly, are cited and approved.

An examination of the authorities there relied on, and of others as well, shows that there is really no question about the rule. Shillito v. Biggert, 9 Aspinall's Maritime Cases, 396; Brown v. Tanner, Law Reports 3 Chancery Appeal Cases, 597; Dobbyn v. H. Comerford, 10 Irish Chancery Reports, 327; Pelayo v. Fox, 9 Pa. 489. Most of the above cases were those in which mortgagees had taken possession of the mortgaged ships. Others were where the owner of a chartered vessel had done the like. In the instant case, the bankrupt was an agreed purchaser in possession. It had no title to the ships, and that the lending companies knew. With that knowledge, it makes very little difference whether they ever took the trouble to inquire as to what the precise terms of the contract of sale were. They did know perfectly well the general financial condition of the bankrupt, and they must be held to have known, as of course they did, that the government had reserved the right to repossess itself of the ships, if the terms of its agreements with the bankrupt were not performed. When they accepted assignments and made advances upon them, they knew what the law was, and they took the chance of collecting the freights before the government repossessed itself of the ships.

[6] If the government's claim to the freights which were completely earned before it retook the vessels is to be sustained, it must be upon other considerations. The contentions made in argument on its behalf, that the right to freight is so inseparably bound up with the ship that a transfer of ownership of the latter automatically transfers the right to the former which was still uncollected, although it was earned before the transfer took effect, is in conflict with practically all the authorities. There is no doubt that freights may be assigned

independently of the ship. That was settled nearly 90 years ago. Leslie v. Guthrie, Law Journal, New Series, 4 C. P. 227. When such an assignment has been made, an assignee of the freights from the mortgagee is entitled to such freights as are earned while the mortgagee is in possession. Merchants' Banking Co., Ltd., v. Cargo of the Afton, supra.

[7] The government replies that, if it be true that the freights may be mortgaged or assigned by way of mortgage apart from the ship, there is nothing to prevent such assignment or mortgage being made with the ship and to the same person. All that is required is that the language of the agreement between the parties shall show clearly that such was their purpose. It says that in the instant case that was precisely what was done. By the terms of the contract between the government and the bankrupt, the former retained title, not only in the ships, but in their earnings as well. These latter were all to be deposited in a special account. It is true that, until the government chose to take over the account, the bankrupt was vested with authority to draw checks against it, provided they were for certain definitely limited purposes. The agreements between the government and the bankrupt antedated the assignments under which the lending companies claim, so that the rights of the latter are junior to those of the United States. The argument is forcible, and indeed conclusive, to the extent, if any, to which the government can show a diversion or misapplication of the funds in which the contracts give it rights. There was a separate contract for each ship, and each of these authorized the bankrupt out of the deposits of the earnings of the ship to make bona fide disbursements incurred in the operation of that particular vessel. With the knowledge of the Shipping Board, and without any objection on its part, earnings from all the ships were deposited in a single account and payments on account of any of the ships were made out of it.

This way of dealing with the earnings was convenient and could not in itself have altered anything of real importance, but there were other departures from the letter of the agreements of which not so much can be said. The consolidated deposit was drawn upon for the general expenses of the bankrupt, such as the salaries of its officials and other shore employees, the cost of the upkeep of its offices, interest on the money it borrowed, and indeed for every expenditure the bankrupt had to make for it, was destitute of any other source of income of any moment. It goes without saying that there might well be question as to whether some of these outlays could be included in the description of "bona fide disbursements incurred in the operation of the vessel" or vessels. The agreements required that the bankrupt should give bond, with surety, that it would make the deposits as stipulated. When it asked a bonding company to write such obligation, the latter wanted an authoritative interpretation of what was meant by the phrase "bona fide disbursements incurred in the operation of the vessel." The bankrupt thereupon put the question up to the assistant counsel of the Shipping Board, and he in turn submitted it to the board's general comptroller, who on November 25, 1920, some months before some of the agreements were executed, gave a written answer in which he said:

"That the disbursements first to be paid out of the operating funds shall be the ordinary operating expenses of the vessels, such as wages of officers and crew, supplies, fuel, food, pilotage, towage, wharfage, loading and unloading expenses, agency fees and commissions, insurance premiums, maintenance, repairs, as well as brokerage, for obtaining freights and any other expenses incidental to securing cargo or operation of the vessel. The bona fide disbursements shall also include the ordinary and incidental expenses of conducting the business, such as office rental, supplies, salaries (clerical), ordinary salaries of officers, interest on money borrowed, and any other ordinary expenses pertaining directly to the operation of the vessel secured under this agreement."

It does not appear that anything paid out of this fund was not included within the definition above given, except quite possibly the larger part of the interest or so-called service charge exacted by the credit companies. This amounted for the Commercial to about 20 per cent.; for the International, to 18¼ per cent. As, however, there is not the slightest chance of either of these companies collecting even the principal which they advanced, the question of whether they would be entitled to the excess interest is of no moment in this case. It does not, therefore, appear that any of the funds once deposited by the bankrupt were misapplied. It is unquestionably true, however, that much money which the agreements contemplated should have gone into this deposit never did. When checks were received for any freights which had been assigned to the Commercial, they were by the bankrupt frequently, probably usually, turned over to the Commercial without going through the bankrupt's bank. No such method of business was contemplated by the agreements, but it does not appear that the government was injured by it. The money which the Commercial advanced upon the security of the assigned freights was used by the bankrupt for the disbursements authorized by the Shipping Board's general controller to be paid out of the special fund. The aggregate of these advances will exceed the amount which upon any theory the Commercial can possibly get back, so that the government has not lost and will not lose anything because some of the freight checks did not pass through this special account.

The United States, however, contends that it is entitled to freight earned before it repossessed itself of the vessels, but at that time still unpaid. It says that as these moneys were earned before the seizure, they were also payable before that time, and should have been then in the special deposit, in which case the government would have been entitled to take them over. It argues that the mere accident that the persons who owed them did not pay them as promptly as they should have done cannot change the rights of the parties, and that the amounts of these bills must be treated as if they had been at the time of the seizure of the ships in the fund, and, if so, they belonged to the United States. Some of the assumptions upon which this reasoning rests do not appear to be in accord with the facts or with the established course of business, at least so far as concerns the transactions in which the Commercial was interested. The money, if collected, would not have been deposited in that account because funds of an equal amount advanced by the Commercial on the faith of the assignment of the freights had already gone through that account, and had been used

in the way the agreement between the government and the bankrupt contemplated it should be. Moreover, the agreements specifically provided that all these disbursements should take precedence over those which were to be made to the government out of the ship's earnings. If the special deposit is to be regarded as a trust fund, as the government contends, would not the unpaid bills for the operation of the ships be the first charge upon it? Nor does the letter of the agreement upon which the government relies support its contention. It is there said that the moneys derived from the operation of the vessel shall be deposited "as received." Among the items to which the government is to be entitled as part of its liquidated damages was "any balance remaining in" the trust fund.

If these more or less technical contentions and answers be put to one side, it is doubtless true that the method by which the bankrupt, with the assistance of the lending companies, financed itself, was in substance very different from that which the agreements contemplated. Instead of the bankrupt collecting its freights and paying its expenses out of them, it was always behindhand. It had sold its freights before they were earned, and was habitually forced to use the money received from their sale to pay obligations of earlier voyages. It is quite possible to believe that in the end the government would have been far better off if the bankrupt had not been forced to live in this hand to mouth fashion. But the lending companies were not in any sense responsible for the fact that the bankrupt began life without any working capital. The government, before it entered into any contract relations with the bankrupt, could and doubtless did inform itself as to the latter's financial condition. It is affirmatively shown that the Shipping Board was later advised that the bankrupt was borrowing money from lending companies and at rates which were described as ruinous. It did not, upon receiving this information, nor for months afterwards, feel that it should avail itself of the bankrupt's then existing defaults to repossess itself of the ships, nor did it exercise its power of taking over the control of the bank account in which the bankrupt deposited its earnings. Under the circumstances, it does not seem that the government is now entitled to say that the lending companies are to blame, because they did not, by withholding advances, compel the bankrupt to shut down its business.

It follows that the lending companies, who before bankruptcy obtained assignments of freights in circumstances under which they would not be voidable under the Bankruptcy Act, have a better title than the government to them, provided that, before the government took back the ships, the bankrupt had completely earned them by the delivery of the cargo from which they arose. The trustee in bankruptcy cannot attack the assignments unless they constitute voidable preferences. Greey v. Dockendorff, 231 U. S. 513, 34 Sup. Ct. 166, 58 L. Ed. 339. Each assignment of freight to the Commercial was for a present consideration, and therefore was not preferential.

The situation of the International differs in important respects. The bankrupt persuaded it that an assignment of the uncollected westbound freights to an aggregate of $125,000 would be ample security for an advance of $100,000. The International lent that sum, and the

bankrupt assigned all the west-bound freights then on its books, and undertook, as fast as new manifests were made up, to assign the freights represented by them to the International. In the meanwhile the bankrupt from time to time in the ordinary course of business collected these assigned freights as they came due and applied them to its own use, without, so far as appears, accounting for them to the International; both parties taking it for granted that the new assignments, which were steadily being made, would keep the lender's security intact. In other words, the borrower collected and used the freights precisely as if they had never been assigned, and the lender, after it lent the $100,000, did nothing but receive new assignments, send back old, and charge up interest, or a service charge, as it preferred to call it, at the rate of 18¼ per cent. per annum. It was not even careful promptly to return old assignments, when new were sent it. At the bankruptcy, it still held assignments aggregating upwards of $215,000. It was conceded that it should have returned the oldest assignment, in point of date, and that was of the Liberator's west-bound freight. At the hearing, it abandoned all claim to it. The three still retained on their face purported to represent an aggregate of more than $140,000, about three-fourths of which, however, the bankrupt had, prior to bankruptcy, already collected and applied to its own uses.

A month or more before the crash came, a new president of the International became dissatisfied with the situation, and insisted that the bankrupt should cease using the assigned freights, and, as they were collected, should at once turn them over to the lender. Two new assignments were to be made, namely, the contemplated west-bound voyages of the Liberator and the Cape Romaine. It was supposed from these, and what was still uncollected upon the assignments previously made, enough would be realized to pay off the entire loan of $100,000. The Liberator's manifests for its west-bound voyage were not made up when the government took back the ships. Indeed, only a small part of its west-bound cargo had then been loaded. No attempt to assign the freights for this voyage was ever made. An assignment of those of the Cape Romaine was prepared and was executed, but it was not delivered until after the crash came. There is more than one reason why the International can claim nothing under it. At the time of the filing of the petition in bankruptcy there were uncollected $27,689.72 of the freights previously assigned to the International, and $8,630 from those so assigned, previously collected by the bankrupt, have come into the hands of the trustee in bankruptcy. As already stated, the International, a month or more before bankruptcy, withdrew the authority, expressed, or implied from long acquiescence, it had theretofore given the bankrupt to apply to its own use the proceeds of assigned accounts, and in consequence we are not confronted with some questions which otherwise might require serious consideration.

As the record stands, the International would appear to be entitled to the $8,630 from assigned freights actually received by the trustee, and to whatever has been or may be collected since bankruptcy of those freights assigned to it, provided the merchandise, for the transportation of which they were to be paid, had been completely delivered before the government repossessed itself of the ships.