# In re ATLANTIC, GULF & PACIFIC S. S. CO.

## In re JOHN J. ORR & SON.

(District Court, D. Maryland. December 31, 1923.)

**1. Maritime liens ⟳25—Stevedoring rendered to ship not in home port lienable.**

Stevedoring is a maritime service which, when rendered to a ship not in her home port, gives rise to a maritime lien, whether libelant physically works or is contractor employing others; Act June 23, 1910 (Comp. St. §§ 7783–7787), and Act June 5, 1920, § 30, subsecs. P–T (Comp. St. Ann. Supp. 1923, §§ 8146¼ooo–8146¼q), relating to necessaries furnished ship in her home port, being inapplicable.

**2. Shipping ⟳154—Admiralty has jurisdiction to enforce pledge of freights for maritime purpose.**

Admiralty has jurisdiction to enforce a lien created by pledging of freights for maritime purpose.

**3. Shipping ⟳154—Assignment of freights in consideration for advancements made without restriction as to use creates no maritime lien.**

An assignment or pledge of sums due for freight in consideration of advancements furnished, without restriction as to purpose, does not create a maritime lien and is subordinate and inferior to a stevedore's lien; Act June 23, 1910, § 4 (Comp. St. § 7786), and Act June 5, 1920, § 30, subsec. S (Comp. St. Ann. Supp. 1923, § 8146¼ppp), not affecting this rule.

**4. Maritime liens ⟳30—Stevedore not required to make inquiry as to existence of nonmaritime liens.**

A stevedore need not inquire as to existing mortgage or other nonmaritime hypothecation as to which his rights are superior, and neither shipowner nor assignee of freights may complain that such inquiry was not made.

In Bankruptcy. In the matter of the Atlantic, Gulf & Pacific Steamship Company, bankrupt. Intervening petition by John J. Orr & Son, claiming a maritime lien for services as stevedores, rendered on the last voyage of the steamship Charles H. Cramp. Decree for intervening petitioner.

Decree affirmed 3 F.(2d) 438. See, also, 3 F.(2d) 311.

John Henry Skeen, of Baltimore, Md., for John J. Orr & Son.

Stuart S. Janney and George Weems Williams, both of Baltimore, Md., for trustee.

ROSE, Circuit Judge. Other issues in these bankruptcy proceedings have been heretofore considered in two reported opinions (287 F. 714, and 289 F. 145), to which reference may be had for many of the facts relevant to the issues raised by the intervening petitions of John J. Orr & Son, who are contracting or employing stevedores and who will hereinafter be called the stevedores. For a number of months preceding August 12, 1922, they had done whatever stevedoring the bankrupts required at Providence, R. I. A few hours or perhaps a few minutes before the government took back the steamship Charles H. Cramp, they had completed the unloading from her of a lot of shingles and lumber consigned to the Dutton Lumber Company, which concern has since paid to the bankrupt estate upwards of $16,000 as the freight thereon. All of the freights of the Cramp were among those assigned,

prior to their being earned, to the Commercial Credit Company, as security for money contemporaneously advanced to the bankrupt. As delivery of the lumber and shingles had been made before the government repossessed itself of the ship, the freight thereon was part of the money to which, as has been heretofore held, the title of the credit company was superior to that of the United States. As the matter now stands, and subject to the effect of whatever differing conclusion may be reached by the appellate tribunal, the instant contest is between the stevedores and the credit company. The former say they have a maritime lien upon the freight paid on the consignment already mentioned for something over $2,600, the amount of their bill for discharging it from the ship. On the other hand, the credit company asserts that a contracting as distinguished from a personally working stevedore has no maritime lien for his services, and that, even if the law, in that respect, were otherwise, any lien which could arise would be postponed to its previously acquired rights. The parties have stipulated that in these bankruptcy proceedings each and every one of them may assert any rights which it has either in admiralty or in bankruptcy. The technical sufficiency of the proceedings have heretofore become of little or no importance, even if they ever counted for much. American Steel Barge Co. v. Chesapeake & Ohio Coal Agency Co., 115 F. 669, 53 C. C. A. 301.

[1] The Cramp at Providence was in a foreign port, and consequently the distinction which in some, but not in all, the cases has been taken between the rights of a stevedore who in the ship's home port himself physically works at loading and discharging the ship and those of a contractor who employs others to do the actual work for him is here immaterial. Luckenbach v. Pearce, 212 F. 388, 129 C. C. A. 64. Importers Steamship Co. v. Houston Marine Engineering Works (C. C. A.) 285 F. 868; The Muskegon (D. C.) 275 F. 117, the same case on appeal 275 F. 348. Stevedoring is a maritime service (Atlantic Transport Co. v. Imbrovek, 234 U. S. 52, 34 S. Ct. 733, 58 L. Ed. 1208, 51 L. R. A. [N. S.] 1157), and when rendered to a ship not in her home port gives rise to a maritime lien, and consequently the discussion as to whether it is included among the necessaries for which, when furnished in a home port, the Acts of June 23, 1910, 36 Stat. 604 (Comp. St. §§ 7783–7787), and June 5, 1920, 41 Stat. 1005, § 30, subsecs. P–T (Comp. St. Ann. Supp. 1923, §§ 8146¼ooo–8146¼q), confer rights, is beside the mark.

[2] Admiralty has jurisdiction to enforce a lien created by a pledging of freights for a maritime purpose. Bank of British North America v. Freights of The Hutton, 137 F. 534, 70 C. C. A. 118. It follows a fortiori that the stevedores have a maritime lien upon the freights enforceable in admiralty and are entitled to assert it in these proceedings unless the assignment to the credit company gives the latter a superior right. Does it? Obviously, the sums becoming due for the freight were transferred to the credit company as security for the payment of its advances. Home Bond Co. v. McChesney, 239 U. S. 568, 36 S. Ct. 170, 60 L. Ed. 444; Le Sueur v. Manufacturers' Finance Co. (C. C. A.) 285 F. 490, 496. In this respect, the assignment does not differ from those dealt with in the Matter of Freights of The Kate (D. C.) 63 F. 707, and in most, if not in all, the other reported cases in which controversies similar to the one now under consideration have come before the courts.

[3] It is, however, unlike the transfer of the Freights of The Kate, supra, in that in the latter the advances were made for the specific maritime purpose of disbursing the assignor's ships in Brazilian ports, while those of the credit company were furnished without any restriction as to the use to which they were to be put. The assignments to secure them were, therefore, no more maritime than is an ordinary mortgage on a ship. Bogart v. The John Jay, 17 How. 399, 15 L. Ed. 95. It is therefore unnecessary here to inquire whether Judge Brown in the Freights of The Kate was right in holding that a general assignment by way of security of the future freights of various ships created a maritime lien upon each and every one of them, irrespective of whether any of the money advanced had been disbursed for its use. Something might be said on the other side of that proposition. Piedmont & Coal Co. v. Seaboard Fisheries Co., 254 U. S. 1, 41 S. Ct. 1, 65 L. Ed. 97. Prior to the act of 1910, 36 Stat. 604, the maritime lien of the stevedores would have been superior to the prior nonmaritime one of the credit company. J. E. Rumbell, 148 U. S. 15, 13 S. Ct. 498, 37 L. Ed. 345. That act did not change the law in any respect with which we are now concerned. Piedmont & Coal Co. v. Seaboard Fisheries Co., supra. In section 4 (Comp. St. § 7786), it expressly declared that "It shall not be construed to affect the rules of law now existing, either in regard * * * to the priority or rank of

liens." That is to say, a subsequently acquired maritime lien continued after the act of 1910, as before, to have a superior right over a previously executed nonmaritime hypothecation. The framers of the act of 1920 in order to protect their newly created preferred mortgages therefore provided in subsection S (Comp. St. Ann. Supp. 1923, § 8146¼ppp), among other things, "that this section shall not be construed to affect the rules of law now existing in regard to, * * * priorities between maritime liens and mortgages other than preferred mortgages upon vessels of the United States."

[4] The stevedores were under no obligation to inquire as to an existing mortgage or other nonmaritime hypothecation because their rights were superior to it, and, besides, such a relation as that which existed between the bankrupt and the credit company has not as yet become so common as to charge the stevedores with the duty of seeking information as to its possible existence. Moreover, it is not likely that any investigation which the stevedores could reasonably have made would have disclosed the fact that the bankrupt had assigned its freight bills. Sellers of accounts are frequently unwilling to disclose that fact, and, in this respect, buyers go far to meet their wishes. McGill v. Commercial Credit Co. (D. C.) 243 F. 647. Neither the government, nor the credit company in the right of the government, may complain that inquiry was not made. The government's rights as owner of the ship did not attach to such freights as have been completely earned, before it repossessed itself of the vessels themselves. 289 F. 145. Even were the law otherwise and were the stevedores chargeable with knowledge of the agreement between the government and the bankrupt, the result would have been the same for, by its express terms, the earnings for each voyage were first to be applied to the payment of bona fide expenses incurred in the operation of that particular vessel on that voyage, and such the cost of this stevedoring was.

In seeking the rules of law governing the rights of the parties to the instant controversy, it is necessary to keep in mind distinctions which, however sound and well established, are likely to seem rather narrow and technical to the party who loses by their application. It so chances, however, that under the special facts here before us, those rules work out a result which the legally unlettered man in the street would feel to be just. Had the stevedores failed to unload the Dutton Company's lumber before the government seized the ship, the United States would have been compelled to pay them or some other stevedores to discharge it. If prior to the government's retaking the vessels, the credit company had been informed that the Dutton Company could not be called on for the freight money until its lumber had been gotten off and that the bankrupt was not able to pay a stevedore to do it, there can be but little question that the credit company would have authorized the payment of the unloading charges out of the Dutton's freight, or would, in the first instance, have paid them itself. Such speculations as to what might have happened are very possibly without legal relevancy, but they at least suggest that in this case the following of the strict rules of law as they have been long established has not led to any result which will seem unfair to a disinterested observer.